**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re | |
| **JOHN PATRICK STOKES**, | Case No.  **09-60265-7** |
| Debtor. | |
| **UNITED STATES TRUSTEE**, | |
| Plaintiff. | |
| -vs- | |
| **JOHN PATRICK STOKES**, | Adv No.  **10-00063** |
| Defendant. | |

**MEMORANDUM OF DECISION**

At Butte in said District this 11ᵗʰ day of April, 2011.

In this adversary proceeding objecting to the Debtor/Defendant John Patrick Stokes' ("Stokes") discharge under several subsections of 11 U.S.C. § 727, the Plaintiff United States Trustee ("UST") filed on March 4, 2011, a Motion (Docket No. 22) seeking summary judgment against Stokes under Counts One-through-Six of the UST's complaint, together with a Statement of Uncontroverted Facts ("SOUF"), supporting memorandum, and exhibits.  Stokes filed a brief in opposition (Dkt. 28) in opposition and a Statement of Genuine Issues of Material Fact (Dkt. 29), accompanied by a sworn Declaration of Stokes and an exhibit.  The UST filed a reply brief (Dkt. 31).  The Court has reviewed the Motion and SOUF, Stokes' response, and the UST's

1

reply, together with the attached exhibits, and applicable law.  This matter is ready for decision. For the reasons set forth below, the UST's motion for summary judgment will be denied for failure to satisfy the heavy burden under FED. R. CIV. P. 56(a) (applicable in adversary proceedings under FED. R. BANKR. P. 7056) to show that there is no genuine issue as to any material fact.

This Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b).  The UST's objections to Stokes' discharge are core proceedings under 28 U.S.C. § 157(b)(2)(J). This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

The UST moves for summary judgment in Count One to deny Stokes' discharge under § 727(a)(2) for concealment of transfers or assets; Count Two under § 727(a)(4)(A) for false oath or account; Count Three under § 727(a)(4)(B) for presenting or using a false claim; Count Four under § 727(a)(4)(C) for attempt to gain advantage; Count Five under § 727(a)(5) for failure to explain loss of assets; Count Six under § 727(a)(6)(A) for refusal to obey an order of the Court.

Stokes objects that genuine issues of material fact remain with respect to all six Counts. He contends that he relied on his former attorney to prepare his original schedules, and that the UST failed to show genuine absence of material fact as to his intent under § 727(a)(2) and § 727(a)(4)(A), and this Court should not draw the inferences of intent as requested by the UST in deciding summary judgment.  Stokes argues that he admitted at the first § 341 meeting that his Schedules needed to be amended.  He argues that the UST has his books and records to reconstruct his business affairs but "just has not bothered to look."  Stokes denied that he filed a false claim for his daughter Elizabeth Pickavance ("Elizabeth") because no such claim exists on

2

the claims register, and because she had the right to object to conversion. Stokes denies that he
attempted to gain an advantage, but rather simply fought the conversion. Stokes denies that he
failed to explain loss of assets because his mortgage against corporate property ceased by merger
when his corporation dissolved and the corporate property reverted to him. Finally, Stokes
denies that he has failed to obey an order of the Court. He contends that he has cooperated with
the Trustee in valuing musical instruments and made his firearms available for valuation, but that
he is entitled to claim exemptions.

**FACTS**

The UST filed with its Motion a detailed SOUF, a memorandum, and fifteen exhibits
(Dkt. 25) including transcripts of 11 U.S.C. § 341(a) meetings, hearings, Rule 2004
examinations, pleadings, affidavits of the Trustee Richard Samson and the Trustee's attorney
James H. Cossitt, discovery responses, and other matters. The SOUF (Dkt. 24) sets forth the
following facts:

> 1. On March 4, 2009, Defendant John Patrick Stokes commenced the
> above-entitled bankruptcy case, by filing a Voluntary Petition for relief under
> chapter 11 (Docket No. 1); and his case was converted to chapter 7 on September
> 21, 2009, on motion of the UST (Dkt. No. 98). Richard J. Samson was appointed
> to serve as the trustee on September 21, 2009 (Dkt. No. 101).
>
> 2. Stokes did not file with his Petition any Schedules, Statement of
> Financial Affairs ("SOFA"), or other required documents, but sought and was
> granted additional time to file such documents, and ultimately filed his original
> Schedules and SOFA on April 3, 2009 (Docket No. 17).
>
> 3. In his Answer to the Plaintiff's Complaint, Stokes admitted the
> following:
>
>> (a) The Court has jurisdiction over this adversary proceeding
>> pursuant to 28
>> U.S.C. §§ 157 and 1334, and 11 U.S.C. § 727.
>> (b) This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).
>> (c) Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).
>> (d) Plaintiff has standing to bring this action pursuant to 11 U.S.C.

3

§§ 307 and 727(a).

4. According to his ECF filing, Stokes signed his original Voluntary Petition on March 4, 2009; and signed his original Schedules and SOFA under penalty of perjury on April 3, 2009, after having received an extension of time from the Court.

5. According to his ECF filing, Stokes signed his amended Voluntary Petition (Docket No. 4) on March 4, 2009; he signed his first amended Schedules and SOFA (Docket No. 69) under penalty of perjury on May 29, 2009 (although they were not filed until July 24, 2009); and he signed his second amended Schedules and SOFA (Docket No. 204) under penalty of perjury on December 3, 2009.

6. On April 10, 2009, the chapter 11 meeting of creditors was commenced pursuant to 11 U.S.C. § 341 ("§ 341"), and Stokes appeared with counsel and testified under oath.

## II. SCHEDULES, AMENDED SCHEDULES, SOFA, AND § 341 MEETING

1. The following list of **assets** portray the different ways that Stokes described the same in various contexts during his bankruptcy case: in his initial Schedules and SOFA; in his first and second amended Schedules and SOFA; and during his chapter 11 § 341 meeting:

(a) **12887 Raven Way, Bigfork, MT**

1) In his initial Sch. A (Dkt. 17), Stokes listed this real property and represented the current value of his interest to be $1.3 million. It was shown to be subject to a $248,585.26 secured claim.

2) During his § 341 Stokes testified that this house belongs to his daughter; claiming he gave it to her as a gift in 1998, but he claimed a life estate in it; although he pays the mortgage payments and expenses (chapter 11 § 341 Tr., pp. 27-28).

3) He did not list a life estate in such property in his original schedules. Instead he affirmatively responded "None" to Question 19 of his original Sch. B inquiring about any life estates he owned.

4) In his first amended Schedules (Dkt. 69) Stokes deleted this $1.3 million real property asset from his Sch. A and instead listed it on Sch. B as a life estate with a "0.00" value in response to Question 19.

5) In his second amended Schedules (Dkt. 204) Stokes deleted any reference to this asset, either as an item of real property on Sch. A or as a life estate on Sch. B, and specifically with regard to Question 19 on the SOFA inquiring about any life estates, Stokes affirmatively represented he had "None."

4

(b) **6.5 Acres for KGEZ 600 AM, Kalispell, MT**

> 1) In his initial Sch. A Stokes listed this real property and represented the current value of his interest to be $1.8 million. It was shown to be subject to a $1.3 million secured claim.

> 2) At his § 341 Stokes affirmed the KGEZ land and building were worth $1.8 million (chapter 11 § 341 Tr., p. 71).

> 3) He confirmed this valuation in both his first and his second amended schedules.

> 4) When he filed his Complaint postpetition on July 13, 2009 against Wade Dahood and his firm, Stokes represented the value of this real property as being worth $2.5 million. (See FACTS Ex. 10)

(c) **FCC Radio License**

> 1) Stokes did not list this as an asset in his initial Schedules; and in response to Question 23 of Sch. B, inquiring about any licenses, Stokes affirmatively responded "None."

> 2) During his § 341 exam, Stokes affirmed under oath his belief that this license was worth $1.5 million (§ 341 Tr., p. 66 and 71).

> 3) In his first amended Sch. A Stokes listed a "KGEZ 600 AM FCC Broadcast" worth $1.5 million, with a secured claim against it for $1,034,752.61. The FCC license was listed again in Sch. B, in response to Question 23, where Stokes listed an "FCC License for Radion (sic) KGEZ" worth $1.5 million.

> 4) When he filed his second amended Sch. B the value of this license was reduced to only $400,000.

(d) **33 Acre Easement for Radio Towers**

> 1) Stokes did not list this as an asset in his initial Schedules.

> 2) During the § 341 Stokes testified that this easement was worth $6.6 million (§ 341 p. 71-71) and that the same was worth $200,000 per acre (§ 341 p. 178).

> 3) He affirmed these same values again in his first amended Sch. A.

> 4) In his second amended Sch. A he claimed the value of this easement was "Unknown."

(e) **Twin Radio Towers**

> 1) Stokes did not list these as assets in his initial Schedules.

2) During his § 341 Stokes testified he owned such towers and claimed they were worth $ 650,000 (§ 341 p. 73).

3) In his first amended Sch. A Stokes represented the "current value of debtor's interest" in these towers to be $800,000, but indicated in a note that this was the "replacement costs" for the towers.
4) In his second amended Schedules these assets were moved from Sch. A to Sch. B and represented to have a value of $600,000. A note under their description indicated this was the "cost to replace."

(f) **Office Equipment, Furnishings and Supplies**

1) In his initial Sch. B at Question 28 Stokes listed "office equipment, furnishings and supplies" with a value of $66,000.

2) He confirmed this valuation at his § 341 meeting (§ 341 pp. 66-71).

3) In his first amended Sch. B he raised the value of such assets to $76,000.

4) In his second amended Sch. B the valuation went down to $500.

(g) **Machinery, Fixtures, Equipment and Supplies Used in Business**

1) In his initial Sch. B at Question 29 Stokes stated affirmatively that he had "None" in his response to this inquiry.

2) In his first amended Sch. B Stokes indicated he owned two transmitters and transmission electronics worth $9,000.

3) In his second amended Sch. B he represented he owned two broadcast towers with a "current value" of $600,000, but that the two transmitters and transmission electronics were only worth $4,500.

(h) **Fishing Gear**

1) In his initial Sch. B Stokes generically listed "fishing gear" as having a value of $300.

2) During his § 341 Stokes testified he owned fishing gear worth $30,000 (§ 341 p. 48).

3) In his first amended Sch. B he listed and itemized fishing gear worth $37,960.

4) In his second amended Sch. B Stokes listed and itemized the same fishing gear but represented the same was only worth $1,155.

(I) **Guns**

1) In his initial Sch. B Stokes listed only one Winchester 12 gauge shotgun

6

worth $100.

2) During the § 341 he testified he owned about a dozen guns (§ 341 p. 45) worth  about $6,000 (§ 341 p. 149).

3) In his first amended Sch. B he listed and itemized guns worth $7,300.
4) In his second amended Sch. B he listed and itemized the same guns but represented they were only worth $950.

**(j) Guitar Collection**

1) In his initial Sch. B Stokes did not list any guitars.

2) During his § 341 he testified he owned a large collection of guitars, worth some    $10,000 (§ 341 p. 51).

3) In his first amended Sch. B he listed and itemized guitars and amplifiers worth $8,820.

4) In his second amended Sch. B he listed and itemized guitars and amps but represented they were only worth $615.

**(k) 10' Observatory and 8" Celestron Telescope**

1) Stokes did not list these as assets in his initial Sch. B.

2) He did not disclose them during his § 341 meeting.

3) These assets first showed up on his initial amended Sch. B with a combined value of $6,500.

4) In his second amended Sch. B the combined value of these assets dropped to $750.

**(l) Accounts Receivable**

1) In his initial Sch. B in response to Question 16, Stokes listed accounts receivable with a current value of $74, 868.69.

2) During his § 341 it was discovered that the attachment referenced in regard to this Question was not his accounts receivable, but was, in fact, all of Stokes's gross income for the year of 2008. He testified at the § 341 that this figure should have been $6,200 (§ 341 pp. 56-57).

3) In his first amended Schedules Stokes still maintained that his accounts receivable were $74,868.69.

4) In his second amended Schedules Stokes dropped this number to only $2,428.

**(m) Automobiles, Trucks, Trailers, and Other Vehicles and Accessories; and**

7

**Boats, Motors and Accessories**

1) Originally, Stokes responded to Question 25 of his Sch. B by listing only one vehicle, a 2002 Dodge 1500 pickup, with a current value of $2,075. He did not list any boats, motors and accessories in response to Question 26 of his original Sch. B.

2) During his § 341 Stokes admitted this was a mistake, both as to the number of vehicles he owned, and as to the value of the Dodge. He testified this pickup was worth $12,000 (§ 341 p. 68). At his § 341, Stokes orally listed a large number of vehicles, trailers, boats and recreational vehicles he owned which were not disclosed in his initial Schedules. The following list indicates the assets which were not listed by Stokes in his initial Schedules, portraying the value given to these items by Stokes in his first amended and second amended Schedule B:

| Assets: | First Amendments: | Second Amendments: |
|---|---|---|
| 1985 Winnabego RV | $5,000 | $3,500 |
| 1987 American Jeep | $7,000 | $ 700 |
| 2001 PT Cruiser | $3,655 | $2,500 |
| 1985 Mann Trailer | $1,200 | $ 600 |
| 1988 Ford Bronco | $1,913 | $1,000 |
| 2004 Kawasaki ATV | $1,500 | $ 750 |
| (3) Yamaha Snowmobiles | $1,500 | $ 400 (he only listed one in his second amendments) |
| (2) Honda 3-Wheelers | $ 200 | $ 200 |
| 14' Boston Whaler Boat | $6,000 | $1,500 |
| Boat Trailer for Whaler | $ 750 | $ 750 |
| 20' Boat and Trailer | $20,000 | $1,500 |
| 1991 EZLoader Trailer | $1,500 | $ 300 (shown to be 1992) |
| 2004 Boat Trailer | $1,500 | $ 750 |
| 1988 EZLoader Trailer | $ 300 | (not listed) |

3) In his second amended Schedules he listed the value of the 2002 Dodge pickup at only $4,200.

(n) **Equitable or Future Interests, or Life Estates**

1) In his initial Schedule A Stokes represented that he owned the house at 12887 Raven Way, in Bigfork, Montana, and represented the "current value of [his] interest in [the] property without deducting any secured claim of exemption" was $1.3 million. In response to Question 19 of Schedule B, he affirmatively stated "None" when asked if he had any equitable or future interests or life estates.

2) During his chapter 11 § 341 meeting he claimed to have gifted the house at 12887 Raven Way to his daughter, Elizabeth Pickavance, in 1998. (See chapter 11 § 341 Tr, at pp. 27-28; FACTS Ex. 1)

8

3) In his first amended Schedule A the house at 12887 Raven Way was no longer listed, and Question 19 of Schedule B had been amended to reflect a life estate in this property.

4) During his chapter 7 § 341 meeting it was acknowledged that Stokes did not have a life estate in the house at 12887 Raven Way.

5) In his second amended Schedule B in response to Question 19 inquiring about a life estate, Stokes responded "None."

(o) **Claims and Counterclaims**

1) In his initial Schedules Stokes did not list any claims or counterclaims he had against others individuals. In response to Question 21, he affirmatively stated "None" when asked if he had any contingent or unliquidated claims of any nature, including counterclaims.

2) During his § 341 he disclosed that he did allege claims against others.

3) In his first and second amended Sch. B Stokes listed the following claims against others that he had first disclosed during his § 341:

| Claims Against: | First Amendments: | Second Amendments: |
| --- | --- | --- |
| Poeschels and Others as punitive damages | $1.2 million plus treble | Unknown |
| Wade Dahood, et al. | $410,000 | Unknown |
| Gardners | $12 million | Unknown |
| HSBC Mortgage | $0.00 | (not listed) |
| Greg Paskell | (not listed) | (not listed) |
| Hon. Judge Stadler | $0.00 | (not listed) |
| Hon. Judge Curtis | (not listed) | (not listed) |
| Farmers Union | $70,000 | Unknown |
| Andersons | $0.00 | (not listed) |
| City of Kalispell | $0.00 | $35,000 |
| Mont. Dept. of Transport. | $0.00 | (not listed) |
| Questa and Various Investors | (not listed) | Unknown |

2. The following list of **liabilities** portray the different ways that Stokes described the same in various contexts during his bankruptcy case:

(a) **Schedule D - Secured Claims**

1) In his initial Sch. D Stokes listed only three secured creditors: First Interstate Bank with a lien on his 2002 Dodge pickup. HSBC Mortgage Services with a "Home Loan" on 12887 Raven Way (the debtor's residence, that he has later claimed he transferred to his daughter, retaining only a life estate). HSBC's collateral was represented to be worth $1.3 million (which was the figure Stokes represented his house at 12887 to be worth in Sch. A). And Questa Resources with a lien on the KGEZ radio

9

station property. Absent from the initial Sch. D was the $3.8 million judgment that had been obtained by Todd and Davar Gardner.

2) In his first amended Sch. D he added the names of various parties who he claimed were assignees of the Questa debt. The value of HSBC's collateral was now represented to be $2,314,750. And, he added the name of his daughter, Elizabeth Stokes-Pickavance, as a secured creditor, whose collateral was said to be "Security is 2995 Hwy 93 South together with easement." The amount of this secured indebtedness was claimed to be $2,314,750.00. The value of her collateral (the 6.5 acres occupied by Stokes's KGEZ radio station) was represented to be $2,314,750 (which matched the new value given to HSBC's collateral in the second amended Sch. D), but Elizabeth's collateral was represented to be the debtor's radio station (which was listed in the first amended Sch. A as having a current value of $1.8 million), and HSBC's collateral was said to be Stokes's home (which was deleted from the first amended Sch. A, but which was represented as having a value of $1.3 million in Stokes's initial Sch. A).

3) The dollar amounts of the secured claims of HSBC and Elizabeth do not match any of the "secured claims" listed on Stokes's first amended Sch. A. And, the $2,314,750 dollar value listed in Stokes's first amended Sch. D as the value of HSBC's and Elizabeth's collateral cannot be found next to any of Stokes's real property assets listed in his first amended Sch. A.

4) The only "amount of secured claim" found next to the parcels of real property listed in the first amended Sch. A is the number $1,034,752.61. The only secured claim this matches is in the first amended Sch. D is that held by Questa Resources. Neither the amounts of the secured claims nor the current values of the real properties listed in the first amended Sch. A match the dollar amounts of the secured claims of HSBC or Elizabeth, or the values of the collateral alleged to be held by HSBC and Elizabeth in the first amended Sch. D.

5) Stokes did not disclose his daughter Elizabeth's alleged secured claim during his § 341 meeting. This alleged $2.3 million secured liability was never mentioned during the § 341.

6) This claim disappeared entirely in Stokes's second amended Sch. D, as did the "Home Loan" in favor of HSBC Mortgage Services and its lien on 12887 Raven Way.

7) Stokes is liable on the HSBC debt, as evidenced by the proof of claim filed by HSBC Mortgage Services (Claim No. 1, filed March 20, 2009).

**(b) Schedule E - Priority Claims**

1) In his initial Sch. E Stokes affirmatively checked the box indicating he had no creditors holding unsecured priority claims to report.

2) In his first amended Sch. E he listed over $30,000 in real property taxes on his home and his radio station, and he also listed over $57,000 in "back

taxes" owed to the IRS. And he listed a claim owed to the Montana Dept. of Transportation in a $0.00 amount.

3) In his second amended Sch. E he listed the IRS with a $0.00 claim (for "Notice Only"), listed the Montana Dept. of Revenue with a $0.00 claim (for "Notice Only"), and listed the Montana DLI (Dept. of Labor and Industry) for $3,374.73 in unemployment taxes.

4) In his § 341 Stokes testified he had not filed Montana income tax returns since he became a resident of this state in 1994. (§ 341, p. 82)

### (c) Schedule F - Unsecured Claims

1) In his initial Sch. F Stokes listed only eight unsecured nonpriority claims, totaling $57,425.17.

2) In his first amended Sch. F he listed ten claims, totaling $3,873,108.13 (adding the Gardners' $3.8 million judgment).

3) In his second amended Sch. F he listed nine claims, totaling $318,318.66 (deleting the Gardners' claim).

### (d) Schedule H - Codebtors

1) In his initial Sch. H Stokes affirmatively checked the box indicating he had no codebtors.

2) During his § 341 he testified that his wife, Pamela, was a codebtor on the Questa home loan. (§ 341 Tr., pp. 97-98)

3) In his first amended Sch. H he listed his daughter Elizabeth as being a codebtor on a student loan, and also as being a codebtor on the Questa Resources debt. He listed his wife, Pamela, as a codebtor on the Questa Resources debt, as well.

4) In his second amended Sch. H all of these debts were deleted and Stokes only listed his daughter Elizabeth as being a codebtor on the indebtedness to HSBC Mortgage.

5) Pamela Stokes testified in her Rule 2004 examination that she was jointly liable on the HSBC debt against the house she shares with Stokes. She also acknowledged that she was jointly liable on the debt to Questa and its assigns. (Pamela Stokes 2004 Tr., pp. 103 and 121; FACTS Ex. 7)

6) According to the Proof of Claim filed in this case by the Boone Karlberg Profit Sharing Trust, et al. (Claim No. 9, filed on November 12, 2009), Pamela Stokes is a party to the $665,000 Questa note, which was later assigned to the Boone Karlberg Profit Sharing Trust, et al. (which obligation has risen to an unpaid amount in excess of one million dollars).

### (e) Schedule I - Current Income

11

1) In his initial Sch. I Stokes represented his current income from his business was $6,000.

2) In his first amended Sch. I this figure was changed to $7,202.

3) Stokes did not file a second amended Sch. I.

(f) **Schedule J - Current Expenses**

1) In his initial Sch. J Stokes represented his current expenses were $3,695.11, which, after subtracting the same from his $6,000 currently gross monthly income, left him with net monthly income of $2,304.89.

2) In his first amended Sch. J he claimed his monthly expenses were $7,290.36, which, when subtracted from his $7,202 gross monthly income, left him with a negative net monthly income of $88.36. [The biggest difference between the two Sch. Js was the addition of $3,364.25 in "regular expenses from operation of business" on the first amended Sch. J that was not found on the original Sch. J.  On the statement of Business Income and Expenses originally filed by Stokes, he reflected no estimated future monthly expenses, so that his gross monthly income of $6,000 equaled his average net monthly income of $6,000. The first amended statement of Business Income and Expenses added monthly expenses of $3,364.25, which when subtracted from gross monthly income of $7,202 left Stokes with an average net monthly income of $3,837.75 from operation of his business but before personal living expenses.]

3) Stokes did not file a second amended Sch. J.

3. The following summaries portray the different ways that Stokes responded to the same **questions** in his Statement of Financial Affairs:

(a) **Question 1 - Income from Employment or Operation of Business**

1) In his initial response to this Question in his SOFA Stokes indicated his gross income in 2007 was $72,000; he represented his income was the same in 2008; and his income through the date of his bankruptcy filing in 2009 was stated to be $24,000.

2) In his first amended SOFA Stokes said his gross income in 2007 was $86,429.14; his gross income in 2008 was the same; and his gross income in 2001 through the date of his bankruptcy filing was listed at $36,010.

3) In his second amended SOFA his gross annual incomes had changed to $96,358 in 2007; $86,625 in 2008; and $41,253.41 through the date of the commencement of his bankruptcy case in 2009.

(b) **Question 3 - Payments to Creditors**

1) In his initial and first amended answer Stokes responded "None" and affirmatively stated he had made no payments to creditors on the eve of his

12

bankruptcy filing.

2) In his second amended SOFA he reflected he had made monthly payments of $6,300 to HSBC Mortgage within the 90 days preceding the commencement of his case.

**(c) Question 4 - Suits and Administrative Proceedings**

1) In his initial SOFA Stokes listed five lawsuits to which he was a party within a year of his bankruptcy filing.

2) In his first amendments he deleted reference to "William E. Mytty et al v. Stokes et al." but added references to the following: potential suit against the Gardners; potential suit against the Andersons; potential suit against the City of Kalispell regarding a condemnation case; potential suit against Wade Dahood and his firm; potential suit against Judge Stewart Stadler; potential suit against Farmers Union Insurance; another potential suit against the City of Kalispell; and a potential suit against HSBC Mortgage Services.

3) During his § 341 Stokes discussed the above potential claims against others, but also stated his intention to sue Judge Katherine Curtis for violation of his constitutional rights. (§ 341, pp. 63-65)

4) In his second amended SOFA Stokes deleted all but four suits: Gardner v. Stokes; Poeshel v. Stokes; Montana DOT v. Stokes; and Stokes v. Questa.

**(d) Question 8 - Losses**

1) In his initial and first amended SOFA Stokes listed a $70,000 loss when Farmers Union Insurance refused to pay his claim for a swimming pool collapse.

2) His second amended SOFA saw this answer changed to "None."

**(e) Question 11 - Closed Financial Accounts**

1) In his initial SOFA Stokes revealed a closed business checking account at Rocky Mountain Bank.

2) In his first and second amended responses Stokes checked "None."

**(f) Question 14 - Property Held for Another Person**

1) In his initial and first amended SOFA Stokes reported "None."

2) In his second amended SOFA he listed Elizabeth Pickavance, and wrote:  "Debtor lives in a house in Ms. Pickavance's name. Also she has various of her own items stored on the property such as a boat."

13

(g) **Question 18 - Nature, Location and Name of Business**

1) In his initial and first amended SOFA Stokes listed Skyline Broadcasters Inc. and Z-600 Inc., as well as Elizabeth Stokes as the names of his businesses in which he held an interest within the six years preceding his bankruptcy. [He testified that both corporations were dissolved and rendered "defunct" in 2002, with all of their assets from that point forward becoming his own personal assets – (See chapter 11 § 341 Tr, at pp. 11, and 15-16)],

2) In his second amended SOFA he deleted reference to Elizabeth Stokes.

(h) **Question 19 - Books, Records and Financial Statements**

1) In his initial response Stokes responded "None" to this question.

2) In his first amended response he stated that Elizabeth Stokes-Pickavance was the bookkeeper or accountant for the two years prior to filing, and stated that Ms. Pickavance had audited the books of account and records, or prepared financial statements of the debtor within the prior two years.

3) In his second amended response he answered "None" to everything, including whether or not anyone was the bookkeeper or accountant for the debtor, except the fact that Ms. Pickavance audited his books and records or prepared a financial statement for him.

## III. STOKES DECLARED THREE TIMES, UNDER PENALTY OF PERJURY, THAT HIS SCHEDULES AND SOFA WERE TRUE AND CORRECT

On three separate occasions, Stokes signed Schedules and Statements of Financial Affairs declaring the same to be true and correct under penalty of perjury:

1) Stokes's original Summary of Schedules reflected he owned assets totaling $3,248,042, and owed liabilities totaling $1,607,399

2) The Summary pertaining to his first amended Schedules increased his total assets to $26,167,631; and increased his total liabilities to $7,560,603.

3) The Summary of his second Amended Schedules reflected assets of only$2,868,103, and liabilities of $5,129,082.

4) Stokes signed all three sets of his Schedules and SOFAs under penalty of perjury and attested that all three sets were true and correct, despite the million dollar differences in numbers.

5) During the conversion hearing held before the Bankruptcy Court on August 13, 2009, Stokes related claims he alleged against many parties totaling over $100 million, and added an alleged claim against Montana

District Court Judge Steward Stadler who, according to Stokes, cost him $11 million and deprived him of his constitutional right to a fair trial. (Conversion hearing, Tr. p. 73-75)

6) Stokes testified he also had a claim against District Court Judge Katherine Curtis, but no claim against Judge Curtis was ever listed by Stokes in any of his Schedules. (Conversion hearing, Tr. p. 74-75)

## IV. STOKES' POSTPETITION COMPLAINTS AGAINST OTHERS

1. On July 13, 2009, postpetition, Stokes filed a "Complaint for Embezlement (sic), Extortion and Damages" (Docket Nos 74, p. 9, and 81-18) in the District Court of the Eleventh Judicial District of the State of Montana, In and For the County of Flathead, in Cause No. DV- 09-897C, against Wade Dahood, Ben Everett, and Knight Dahood Sievers Everett, Attorneys at Law, seeking damages in the following amounts with regard to the various counts alleged:

(a) $370,000 for the "amount of over payment of attorney fees and embezzlement. Plus treble punitive damages and any and all penalties for felony embezzlement."
(b) $1,300,000 for the "just compensation" the defendants failed to obtain for Stokes.
(c) $11,000,000 for the "defendants' gross incompetence in the Stokes v. State of Montana" litigation.
(d) $1,300,000 for "a loss to Stokes... in the Questa case then recanting in favor of [defendant's] other client."
(e) $500,000 for the defendants' "criminal act of extortion."
(f) $4,350,000 for the defendants' "negligence."

2. On or about July 13, 2009, postpetition, Stokes filed a "RICO Complaint and Complaint for Damages and Void the Judgments Entered Obtained (sic) by Perjury, Restore Damage to KGEZ Towers, Terminate the Serviant Tenants (sic) Estate, Actually (sic) and Punitive Damages" (Docket Nos. 74, p. 21, and 81-17) in the District Court of the Eleventh Judicial District of the State of Montana, In and For the County of Flathead, in Cause No. DV-09-896A, against Davar Gardner, Viki Gardner, Todd Gardner, Sarah Gardner, Trent Gardner, Robert Baldwin, Gardner's Development LLC, and Gardner's Auction Services, seeking damages in the following amounts with regard to the various counts alleged:

(a) To void the Gardners' judgment against Stokes and "terminate the serviant tenants (sic) estate and order the property returned to its previous condition."
(b) $10,700,000 in damages.
(c) $24,000,000 in damages.
(d) $3,800,000 in damages.
(e) $1,100,000 in damages.
(f) $3,800,000 in damages plus punitive damages.
(g) $3,800,000 in damages plus punitive damages.
(h) $3,800,000 in damages plus punitive damages.
(I) $1,800,000 per occurrence in damages.

15

(j) $10,700,000, plus punitive damages.
(k) $3,800,000 plus treble punitive damages.
(l) $24,000,000 in damages, plus $3,800,000 in damages, plus $1,000,000 "for every year of litigation."

3. On or about July 13, 2009, postpetition, Stokes filed a "Complaint for Usury and Void Settlement Made in Bad Faith" (Docket Nos. 81-19; FACTS Ex. 9) in the District Court of the Eleventh Judicial District of the State of Montana, In and For the County of Flathead, in Cause No. DV-09-898B, against Questa Resources, Boone Karlberg Employees Profit Sharing Trust, et al., seeking damages in the amount of $2.2 million, plus $500,000, plus punitive damages.

4. The above claims and causes of action arose prepetition and were known to Stokes when he filed his bankruptcy case.

5. Stokes did not disclose these claims or causes of action in his original Schedules, and he did not disclose the full amount of the same in any of his amended Schedules.

6. Stokes did not timely amend his Schedules and SOFA when he filed the subject lawsuits.

7. Stokes estimated the total value of his claims against the Gardners and Baldwin in his first amended Schedule B at "only" $12,000,000, and failed to timely amend his Schedules and SOFA immediately upon his commencement of the lawsuit to reflect the true amounts of the claims he had asserted in his complaint.

## V. STOKES ADMITTED NOT REVIEWING HIS ORIGINAL SCHEDULES AND SOFA AT THE CONVERSION HEARING ON AUGUST 13, 2009

During the hearing on the UST's motion to convert, held on August 13, 2009, Stokes admitted he did not review his original Schedules and SOFA before he signed them, verifying under penalty of perjury that they were true and correct:

MR. BALDWIN: ... My question is this: Did you forget the claim against the Gardners that was worth tens of millions of dollars when you were reviewing the original schedules? (Conversion Hearing Tr. at pp. 111-117)
A I never reviewed the original schedules.
Q You did not?
A No. I was asked to sign the last page, and that's what I did. [Emphasis added]
Q Do you have in front of you the transcript of the 341 hearing in this case, sir?
[The Court admitted Gardner's Exhibit 2, which is a transcript of the initial § 341 meeting held on April 20, 2009 - FACTS Ex. 1.]
Q Now, when you were at this meeting of creditors, this 341 meeting, did you understand that you were under oath?
A Yes.
Q Did you understand that you were required to tell the truth?
A Yes.

16

Q Did you do so?
A To the best of my ability. [Emphasis added]

* * * * *

Q Yes, okay. But then you had a question from Mr. Jensen specifically about the schedules. And I'm going to read from the question beginning on line 12 [p. 9]. I will read it, and you tell me if I read it correctly: "QUESTION: Okay. The voluntary petition got filed in an emergency, but the schedules and the statement of financial affairs, similarly, were they filed in hurry?" Did I read Mr. Jensen's question correctly?
A (Inaudible, out of range of microphone) – you did.
Q I want to read your answer now. You tell me if I've read it correctly: "I don't believe so." Is that what you said?
A Yes.
Q So Mr. Jensen asked a follow-up question: "So you had an opportunity to go through the schedules and the statement of financial affairs carefully to ensure that they were accurate?" Is that what Mr. Jensen asked you?
A Yeah.
Q And your answer, under oath, was: "Yes." Is that correct?
A Yes.
Q Okay. And then Mr. Jensen asked you: "And at the time that you signed them under penalty of perjury, did you understand them, to the best of your knowledge and belief at that time, to be true and accurate?" Is that what Mr. Jensen asked you?
A Yes.
Q And you answered: "Yes." Is that correct?
A Yes.
Q So, in fact, you did have the opportunity to review those schedules carefully, and you made sure and believed that they were true and correct and accurate; isn't that right? [Emphasis added]
A Well, let me explain my state of mind when I answered that question.
Q No, sir. I don't mean to be rude, but that wasn't my question.
A Well, when you're reading this, you're misreading his question the way I see it.  Going through the schedules, talking with my –

THE COURT: Mr. Stokes. He gets to answer (sic) the questions; you get to answer the questions.

THE WITNESS: Sorry, sir.
MR. BALDWIN: So when you received these schedules and made sure they were accurate, did you just forget about a claim worth tens of millions of dollars?  That's my question to you, sir?
A It was omitted, yeah.
Q I know it was omitted. I'm asking you why. Was it because you forgot about this claim worth tens of millions of dollars?
A I don't know what my reason for omitting it was. [Emphasis added]
(ending on p. 117)

* * * * *

17

[Stokes admitted he had a period of several weeks to review his amended schedules before he filed them, but stated, at Tr. p. 120... ]

A They sat on my desk, yes. I didn't spend every moment of every two weeks look at it, no.
Q And I didn't ask that, either, sir. Is it true you had a period of weeks to review the amended schedules before you filed them?
A Yes. [Emphasis added]

## VI. STOKES' TESTIMONY AT CONVERSION HEARING ON AUGUST 13, 2009, REGARDING SCHEDULES A AND B – REAL AND PERSONAL PROPERTY

1. During the conversion hearing on August 13, 2009 (at pp. 41-43), Stokes admitted his original Schedules and Statement of Financial Affairs at the time of his initial chapter 11 § 341 meeting of creditors on April 10, 2009, were "a mess" and went on to testify:

MR. JENSEN: Now, at the front end of that 341 meeting, you were asked whether you had an opportunity to go through your schedules and determine whether they were true and correct. Do you recall that?
A Yeah, and I think you recall how that happened. My attorney did all those things.  He was in a rush. He said, "Sign the last page"; I did, and I had no idea what was in the front of all that stuff.
Q But you were asked the question: "So you had an opportunity to go through the schedules and the statement of financial affairs carefully to ensure that they were accurate?" And your response was: "Yes." Do you recall that?
A Yes.
Q And I asked: "At the time that you signed them under penalty of perjury, did you understand them, to the best of your knowledge and belief at that time, to be true and accurate?" And your response was: "Yes."
A Yes. [Emphasis added]
Q But as we went through the 341 meeting, it became apparent that that wasn't the case, that they were not accurate; is that right?
A That is correct. There was an awful lot of typos.
Q Well, beyond typos, just assets that were not there, correct?
A Which ones are you referring to?
Q Well, we'll get to that. During the 341 meeting, it was your agreement that you would remedy the schedules and file amended schedules within a 10-day or an abbreviated period, correct?
A Correct.
Q And that didn't happen?
A No, it did not.
Q In fact, you didn't file amended schedules until late last month, I believe; July 24th, to be exact.
A Correct. (ending on p. 43)

* * * * *

Q Mr. Stokes, I'd like to present you with the original schedules that

18

you've filed and then the amended schedules that you've filed so we can talk about the differences.
A <u>Oh, I'm going to – we can save a lot of time. I can tell you they were horrible, they were wrong</u>. [Emphasis added.] (p. 43)

2. Between pages 47 and 48, Mr. Stokes was asked about many discrepancies between his original Schedules and SOFA and the amended set he filed on July 24, 2009. His responses to some of the many discrepancies are set forth below:

[With regard to Schedule A, comparing the original with the amended]
Q Okay. Now there are three new pieces of property listed here that were not originally scheduled.
A Yes.
Q Let's start with the top one: A 33-acre easement for tower construction.
A Hm-hmm.
Q <u>That wasn't disclosed originally</u>?
A <u>That was omitted</u>. [Emphasis added.]
Q That has a value of 6.6 million, according to your opinion?
A In my opinion.
Q With a debt against it of 1,034,000.
A Right.
Q And then we also have an FCC – a KGEZ 600 AM FCC broadcast listed as an asset.
A That's correct.
Q <u>It wasn't originally on the schedule</u>?
A <u>It was omitted</u>. [Emphasis added.]
Q And that has a value of 1.5 million?
A Approximately.
Q And, again, is that the same indebtedness? When it shows in the right-hand column, 1,034,000, is that the same indebtedness?
A That's correct.
Q Okay. <u>And then we have two 325-foot broadcast towers that were not listed in the original schedules.</u>
A <u>They were omitted</u>. [Emphasis added.]
Q And you ascribe a value to those of $800,000[?]
A Correct.
Q So originally when you filed bankruptcy, your schedules reflected that you had $3,100,000 in real-property assets?
A Yeah. It was –
Q And now you have disclosed that you essentially have $10,700,000 in real property assets. (ending on Tr. p. 48)

3. Stokes was then shown his written answers to interrogatories he filed in the context of the Gardner v. Stokes defamation action (Exhibit 9 to conversion hearing). (Tr. p. 48) He acknowledged the handwriting on the answers was his and confirmed it was his signature on the last page. (Tr. p. 49) Asked about Interrogatory No. 14 on page 10 (dated Feb. 25, 2008), which asked "Please identify each and every one of your assets" he listed just one asset: (Tr. p. 49-53)

Q And as far as I can see, you listed one asset, a second mortgage on a

160-acre easement acquired in January of 2001 with a value, in your opinion, of $2,800,000; is that correct?
A Yes.

\* \* \* \* \*

Q So in March or April of 2009, you're saying that you have additional assets. You have – in fact, the – I don't see the easement listed on your Schedule A originally.  It says Raven Way in Bigfork, and 6.5 acres in Kalispell, and what's your radio station status.
A Correct.
Q Did you omit the $2.8 million asset on your original schedules?
A Yes.

\* \* \* \* \*

Q I guess my original question was: Where do you reflect this $2.8 million asset in your original or amended schedules?
A Well, now I don't think it's mine. My daughter owns it. Okay? So she wouldn't list it on mine.
Q So it was your –
A (Inaudible, talking over each other) – this interrogatory.
Q It was yours at the time on February 25, 2008, and now it's not?
A Right.
Q Did you transfer it to her during that period of time?
A It was way before that. It was in – oh, I'd have to check the record, it's been six or seven years, I think.
Q Then why did you list it as an asset in these interrogatory answers?
A I fired those out in 10 minutes. And got it trouble for it, I got sanctioned, I got penalized for it, and I got a $4 million judgment against me for it. [Emphasis added] (ending at p. 53)

    4. With regard to Schedule B, comparing the original with the amended:
(Tr. p. 55)

Q [With regard to firearms] Originally, you listed a 12-gage shotgun Winchester with a value of $100 and fishing gear with a value of $300, correct?
A That was a typo error, yes.
Q And your amended schedules, there's a significant change. There's far and away more guns and fishing equipment and an addition of another category called "guitars", correct?
A Correct.
Q So now you have guns worth in the neighborhood of, just looking at this, $10,000; we have fishing gear that you list at nearly $40,000; and we have guitars that you've listed at almost $9,000, correct?
A Yes.
Q And why were not these assets originally scheduled?
A They were omitted either in the typing or – by the time they got to you, it's hard to say.
Q Now, you signed these original –

20

A Yes, I –
Q <u>– documents under penalty of perjury that says you've read them and you understand them and they're true and correct?</u>
A <u>And that was a very bad mistake on my part.</u> [Emphasis added.]
Q Can you flip the page one more time and look at Item 19? Item 19 has to do with equitable or future interest, life estates, etc. Are you there?
A Yeah.
Q <u>Originally, you said you had none, no life estate or any other equitable interest, correct?</u>
A <u>If that's what it says, yes.</u>
Q <u>And now you're saying you have a life estate in the property at 12887 Raven Way in Bigfork, correct?</u>
A <u>Yes, I have --</u>
Q <u>But you ascribe no value to that?</u>
A <u>No.</u>
Q <u>Okay, But this is the same 12887 Raven Way in Bigfork on your original schedules that you claimed you owned and had a value of $1.3 million, right?</u>
A <u>Yes.</u> [Emphasis added]
Q Can we turn the page one more time and look at Item 21 – or I guess it's on the same page of the first and the next page of the amended. It says: List all other contingent and unliquidated claims of every nature, including counterclaims that you have against other people.
A Correct.
Q <u>And, originally, you said you had none.</u>
A **That was an omission on part, but it happened**. [Emphasis added.]

5. With regard to his counterclaims against Donna Poeschel and the Gardners, Stokes testified:

Q Okay. That was a counterclaim that existed at the time you filed your bankruptcy case?
A Yes.
Q That had been filed before the –
A Correct.
Q And had it been filed for $1.2 million?
A Yes.
Q <u>Okay. And why wasn't that claim listed originally on your schedules?</u>
A <u>I have no idea.</u> [Emphasis added]
Q And then you claim that you have a potential claim against the Gardners, the Gardner Family.
A Correct.
Q And it's, from your estimation, worth $12 million?
A Somewhere in there.
Q Okay. <u>And this was a claim that existed on the day you filed bankruptcy?</u>
A <u>Yes.</u>
Q <u>And why wasn't that claim listed?</u>
A <u>It was omitted.</u> [Emphasis added]

6. At Tr. pp. 59-62, Stokes identified the complaint he filed postpetition

21

against the Gardners, hearing Exhibit 17, that he filed in Flathead County on July 13, 2009. He sued the Gardners for tens of millions of dollars in damages.

> Q But in fairness to your creditors, if you thought you were entitled to $50 million, you should probably ascribe that value to the, to the asset when you listed it in your schedules.
> A Okay.

7. At Tr. p. 64, Stokes identified the complaint he filed postpetition against Wade Dahood and his law firm, hearing Exhibit 18, that he filed in Flathead County on July 13, 2009.  As is reflected in the complaint, he sued for millions of dollars in damages.

> Q And in your amended schedules, you gave a value of that claim of $410,000, correct?
> A Correct.

8. At Tr. pp. 67-70, Stokes identified the complaint he filed postpetition against Questa Resources, Boone Karlberg Employee Profit Sharing Trust and others, hearing Exhibit 19, that he filed in Flathead County on July 13, 2009. As is reflected in the complaint, he sued for millions of dollars in damages.

> Q Okay. I'm looking on your amended schedule. <u>This does not appear anywhere on your original schedules, does it?</u>
> A No –
> Q And the other – <u>it looks like the other lawsuits didn't appear, either.</u>
> A They weren't, right. This was done in May; these were done in July.
> Q ... <u>Is this claim listed anywhere in your amended schedules</u>?
> A <u>No</u>. [Emphasis added]

> \* \* \* \* \*

> Q So you felt strongly enough about filing a complaint, a formal complaint making these allegations, filing it with the District Court in Flathead County, but it doesn't appear in your Schedule B.
> A Right. Schedule B was prepared in May, signed in July.
> Q Yeah. But you signed it on July – on or about July 24th when it got filed
> A Right.
> Q <u>You signed it under penalty of perjury.</u>
> A <u>Right.</u>
> Q <u>And on July 24th, 2009, it sounds like you knew these schedules to be incorrect.</u>
> A <u>I probably didn't review them in those two months, no. And I was just in a hurry to get them in.</u> [Emphasis added] (ending on Tr. p. 70)

9. At Tr. pp. 73-75, Stokes testified about his claims against two state district court judges.

> Q You list a potential claim against Judge Stewart Stadler.
> A Hm-hmm.
> Q Is he a judge in Flathead County?

A Correct.
Q You're thinking about suit him?
A Thinking about it.
Q And your cause of action would be for what?
A Violation of my constitutional rights to a fair trial.
Q ... And it's not listed in your initial schedules?
A No.
Q During the 341 hearing when we were going through your causes of
action that weren't listed, I believe you talked about a lawsuit that you
were going to file against the Judge Curtis, Katherine Curtis.
A Correct.
Q And I don't see that listed here in your amended Schedule B.
A Well, I haven't decided to do it yet.
Q ... If you had any inclination that you were going to or you had a right to
[sue her], you would list it under Schedule B, right?
A I believe so.  [Emphasis added]
Q And that's where it should be?
A Right.
Q So are you in agreement that you should list a potential suit against her
as well as your suit, potentially, against Judge Stewart?
A Didn't I list it there, though?
Q I don't see her. I just see the Judge Stewart and not Judge Curtis. Is that
an oversight on your part?
A ... Yeah, it was an omission. Sorry. [Emphasis added] (ending on p. 75)

10. Asked, at Tr. p 75, why he did not disclose his FCC license for KGEZ
radio in his original schedules that he ascribed a value of $1.5 million to in his
amended schedules:

Q And you omitted that in your original schedules?
A It was an omission.
Q Just an oversight?
A Must have been.

11. Asked, at Tr. pp. 75-76, why he only listed one pickup in his original
schedules and left out several vehicles, boats, trailers, ATV, R.S., snowmobiles,
and motorcycles that the DV report run by Larry Re-enter of the UST Office
revealed:

Q Now, these items together are collectively worth $50,000, perhaps.
Originally, you only listed one truck worth $2,075. Would you admit
that's a large omission on your part?
A Yeah. [Emphasis added]

* * * * *

Q Okay. So if you look at the summary on Schedule B, amended, it shows
assets. [You claim you own assets worth $15,467,631, correct?
A Yes.
Q Originally, you represented that you only had personal property assets
worth $148,000, right?

23

A Now, what was the question?
Q I say originally –
A On this –
Q – when you filed the original schedules, $148,000 total assets, personal property assets?
A Yeah.
Q <u>So a difference of $15,300,000 in assets that were left off your schedules when you filed this bankruptcy case?</u>
A <u>That's correct</u>. [Emphasis added] (ending on p. 79)

12. At Tr. p. 81, in response to a question by the Court as to why, in the amended schedules, Stokes "designated most of the assets as joint":

THE COURT: Who's the joint owner?
THE WITNESS: My wife.
THE COURT: Okay. But she wasn't in the first –
THE WITNESS: No.
THE COURT: – schedule?
THE WITNESS: No. <u>Well, the first schedules were a complete mistake. And I went through that with him, and I was just as shocked that day as you were</u>. [Emphasis added]

13. At Tr. pp. 134-135, when asked whether he ever listed or disclosed his daughter's alleged $2.3 million security interest in his radio station property in his original schedules or at the § 341 meeting, Stokes admitted:

Q You claim that your daughter owns a security interest in the radio station property and the easement property that's worth $2.3 million, correct?
A Correct.
Q <u>And that's the interest that you forgot to put on the original schedules right?</u>
A <u>That was an omission.</u>
Q I didn't try to ask why. <u>But you do agree that you left that out of the original schedules right?</u>
A <u>Right.</u> ... <u>The first filing was a huge mistake.</u> [Emphasis added]
Q We've got that. ... <u>In that [§ 341] meeting, did you mention to Mr. Jensen or Mr. Gardner, "Oh, you know what? There's this $2.5 million I owe to my daughter. I forgot. Here's what that's about." Did you ever mention it?</u>
A <u>No.</u> [Emphasis added] ...

14. At Tr. p. 138-139, Stokes testified about his alleged assignment of the multi-million dollar note and mortgage to his daughter:

Q But there was never anything recorded that reflects this assignment was there?
A Correct.
Q Okay. In fact, the public record still reflects that John Stokes has a mortgage on that property, right?
A That's correct.

24

Q Okay. <u>And when you filed the original schedules, you didn't mention</u>
<u>the assignment to your daughter, correct?</u>
A <u>No.</u>
Q Okay.
A <u>That was an oversight.</u>
Q <u>And when Neal Jensen asked you questions at the 341 meeting, you</u>
<u>didn't mention the assignment, did you</u>?
A <u>I forgot all about it. ...</u>
Q Okay. So the schedules – excuse me, <u>the first time you revealed</u>
<u>anything to any of the creditors or the Court or the trustee about this</u>
<u>claimed interest of your daughter's was after there was a motion to convert</u>
<u>this proceeding to a Chapter 7.  Do you agree with that sir?</u>
A <u>Sure</u>. [Emphasis added]

15. At Tr. pp. 140-142, Stokes was asked again about his interrogatory
answers in the context of the Gardner litigation in state court (hearing Exhibit 9):

Q This is discovery that you answered in that case true?
A Yes. ...
Q Mr. Stokes, this is your handwriting on this document; is that right?
A Yes. ...
Q And on page 10, <u>Interrogatory 14, there's a question that asks you to list</u>
<u>every one of your assets</u>.  Do you see that? ... It says: Please identify each
and every one of your assets. Correct?
A Right.
Q For the record, it doesn't ask each and every one of your daughter's
assets or each and every one of your assets that you assigned many years
ago; it asks for the assets that you owned, correct?
A Yes.
Q <u>And you listed the second mortgage on the 160-acre easement, correct?</u>
A ... <u>Yes.</u>
Q <u>This is the very mortgage that you now say had been assigned to your</u>
<u>daughter some six years prior; is that correct?</u>
A <u>Yes.</u>
Q Okay. ... <u>You didn't list any other assets whatsoever in response to that</u>
<u>inquiry, did you?</u>
A <u>No.</u> [Emphasis added]

16. At Tr. pp. 142-143, Stokes acknowledged that in his answer to
Interrogatory 15 in the context of the Gardner litigation in state court, he took the
position that his radio station's FCC license belonged to the "FCC":

Q You said: The license belongs to the FCC. Do you see that?
A Yes.
Q So in 2008, when we were asking you about your assets – and by the
way, you understood we were asking you about your assets because it had
to do with your net worth for purposes of a punitive damage hearing; is
that correct?
A Correct.
Q ... The fact is, in that context, you said: The license belongs to the FCC.
Correct?

25

A That's a factual statement.
Q ... Okay.  Now, you say the license has a value to you or to the estate of approximately 1.5 million. That's what you say in your amended schedules, correct?
A Correct.
Q But you sure didn't list it in this discovery that said that you had an asset worth 1.5 million, did you?
A No it must have been an oversight. [Emphasis added]

## VII. STOKES' TESTIMONY AT CONVERSION HEARING ON AUGUST 13, 2009, REGARDING SCHEDULE D – SECURED CREDITORS

1. At Tr. pp. 83-85, it was noted that in Stokes' original Schedule D, secured creditors, he listed three creditors as having liens against his property: First Interstate Bank, HSBC Mortgage Services, and Questa Resources:

Q And on your amended Schedule D, page 18 of Docket 69, which we've just marked as Exhibit 25, you have had the Elizabeth Stokes-Pickavance as a secured creditor with a claim, alleged claim of $2,314,750.
A Correct.
Q Who is that, and why is that claim showing up now for the first time?
A Well, it was omitted here. It was mischaracterized here. And it's my daughter's second note on the property, on the radio station, for security pledged in her home.
Q ... But she didn't, she didn't lend you or the radio station $2.3 million?
A No – well, not hard money, no.
Q She just put up her house as collateral along with some collateral you put up?
A And cosigned for the Questa loan, yes. Questa wanted additional collateral, and she put up her own, and property. And the station gave her back security.
Q And why wasn't this listed as –
A It was omitted the first time here. It was an oversight. [Emphasis added]

* * * * *

Q Did you review – you know, we had serious discussions about the screaming deficiencies in your first schedules. Did you carefully review your amended schedules to make sure that there were no errors, omissions, inconsistencies before you signed and filed them?
A Apparently not good enough... [Emphasis added]

2. At. Tr. p. 86, a number of other secured creditors that were omitted from Stokes' original schedules were discussed:

Q Okay. So when you originally filed your Schedule D, you listed total secured claims of $1.5 million. Now it's up to $3.6 million. Just an oversight?
A Oh, I freely admit this first one was wrong. [Emphasis added]

## VIII. MEMORANDUM OF DECISION REGARDING CONVERSION ORDER,

26

**ENTERED SEPTEMBER 21, 2009**

1. In its Memorandum of Decision supporting its Order converting Stokes' chapter 11 case to chapter 7, dated September 21, 2009 (Dkt. No. 97), upheld on appeal, this Court found:

(a) Stokes' Schedules and SOFA were not filed with his petition. (Memo p. 8)

(b) He received an extension to file his Schedules and SOFA. (p. 8)

(c) He testified that his attorney prepared his original Schedules and SOFA in a rush, and that as a result they were "horrible" and "wrong." (p. 8)

(d) He testified that he never reviewed his original Schedules, and that he received the last page of the Schedules and SOFA by facsimile and was asked to sign the last page without reviewing them, which he did. (pp. 8-9)

(e) He did not list his daughter Elizabeth's interest in his residence on his original Schedules, or list her as a codebtor. (p. 9)

(f) The Court noted many assets which were not disclosed in Stokes' original Schedules. For example, Stokes admitted that his failure to disclose his $1.5 million interest in an FCC license for his radio station "must have been an oversight"; and he admitted he did not list the assignment to his daughter of the mortgage on KGEZ on Schedule D, testifying that he forgot about the assignment until after his § 341 meeting. (pp. 8-10)

(g) He testified that his marking "None" in response to Item 21 of Schedule B ("Other contingent and unliquidated claims of every nature...") was an omission on his part, including omissions of claims totaling approximately $10 million. (p. 9)

(h) Stokes admitted that checking the box on Schedule E stating that he has no creditors holding unsecured priority claims was not true (p. 11), and that he admitted he owes 5 years or so of federal employees' taxes, and that he owes the Montana Dept. of Labor and Industry for unemployment insurance contributions. He testified that he has never filed tax returns for the State of Montana. (pp.12-13)

(I) He admitted that he failed to list the $3.8 million judgment entered against him by the Gardners, which he described as the only reason he filed for bankruptcy. (p. 11)

(j) The Court noted: the original Schedules and SOFA were signed under penalty of perjury, but that at the hearing Stokes testified "that he freely admits that his original Schedules were wrong. Ex. 24 includes Stokes' declarations, under penalty of perjury, that he had read the Schedules and SOFA and that they are true and correct the best of his knowledge, information, and belief. Stokes testified that signing them was a 'very bad

27

mistake' on his part. Later Stokes testified: 'I never reviewed the original Schedules' and that 'I was asked to sign the last page.'" (pp. 11-12)

(k) The Court noted: at the initial § 341 meeting held in the context of his chapter 11 case that "Stokes was asked if he had an opportunity to review the Schedules and SOFA carefully to ensure they were accurate, and he answered 'Yes.' He was asked if he signed his Schedules under penalty of perjury if he understood them to be true and accurate, and again he again answered 'Yes'". (p. 12)

(l) Stokes testified that his statement that he took a $6,000 monthly draw was not accurate and that his average net monthly income was closer to $0. (p. 12)

(m) The Court noted: Stokes testified "that he did not mention at the § 341 meeting the $2.5 million which he claims he owes to his daughter, and admitted that during the § 341 meeting "when asked if there were any other creditor that he owes money to for any reason, Stokes answered 'No' and that he went through his schedules 'very well together.'" It was only after the § 341 meeting Stokes testified that he remembered that his daughter had a claim against him. (p. 12)

(n) He admitted that he was asked at the § 341 meeting whether he went through the Schedules and whether they were true and accurate, and he answered yes. (p. 13)

(o) He admitted that during the § 341 meeting he agreed to amend his Schedules to correct errors within ten days, but acknowledged he did not do so. (p. 13)

(p) Stokes filed amended Schedules and SOFA on July 24, 2009, although the date of his signature was May 29, 2009. Stokes testified the amended Schedules sat on his desk. (p. 15)

(q) The Court found Stokes' amended Schedules "continue to reflect serious errors and omissions." (p. 15)

® The Court recognized that Stokes' amended Schedule A listed a total of $10,700,000 in interests in real property, versus $3,100,000 on the original. The original Schedule A listed Stokes' interest in his Raven Way residence in Bigfork with a value of $1,300,000, but this was amended to be a life estate with a value of $0.00. (p. 15)

(s) Schedule B was amended to add more than $60,000 worth of additional firearms, fishing gear, guitars, and an observatory. "When asked under direct examination why these items were not on the original Schedule B Stokes responded that they were omitted." (p. 16)

(t) Item 21 of Schedule B with regard to claims or lawsuits was originally marked "None" but was amended to list seven claims against others. The Court noted Stokes drafted and filed a complaint against the Gardners pro

28

se postpetition, that included thirteen counts and a prayer for several tens of millions in damages.  Stokes testified that the difference between the $12 million value on his amended Schedule B for the suit against the Gardners and the larger amounts requested in his complaint "is because he did not review it closely enough." (pp. 16-17)

(u) Stokes testified he planned to file a combined lawsuit against Judge Curtis and Judge Stadler, but admitted that no claim against Judge Curtis was listed in his amended Schedules or SOFA, "which Stokes testified was an omission." (p. 17)

(v) Stokes admitted that he omitted a number of vehicles from his original Schedules. (p. 17)

(w) The Court noted that the total value of personal property listed on Stokes' amended Schedule B increased to $15,467.631.38 from the $148,042.16 which Stokes listed in his original Schedule B. (p. 18)

(x) Stokes' amended Schedule D added several additional creditors with secured claims. "The largest added secured creditor listed in Schedule D is Stokes' daughter Elizabeth, who Stokes testified has a fully secured claim stated in the amount of $2,314,750 secured by Stokes' radio station property and easement."  Stokes testified that his daughter's omission from his original Schedule D was "an oversight." (p. 18)

(y) The Court wrote: "When asked about the omissions of assets from his amended Schedules, Stokes answered that he did not check them before signing."  (p. 19)

2. At the conclusion of its Memorandum of Decision (Dkt. No. 97), the Court wrote:

"Little more needs to be added to the record about the condition of Stokes' original Schedules and SOFA. Literally millions of dollars of purported assets were omitted from the Schedules, including lawsuits, vehicles and at least one boat. Stokes admitted his Schedules and SOFA contained numerous errors and omissions, and blames his attorney for the condition of the original Schedules.  However, Stokes voluntarily selected Duncan as his attorney of record, and he cannot avoid the consequences of the acts or omissions of his freely-selected attorney." (Citing authority.) (p. 29)

3. In addition to the condition of Stokes' original Schedules, the Court noted:

"Of particular concern is Stokes' testimony regarding his signed declarations on Ex. 24, which were signed under penalty of perjury, that he reviewed the Schedules and SOFA and that they were true and correct. His declarations are not truthful." [Emphasis added] (p. 30)

4. The Court went on to comment:

29

"For Stokes to sign declarations under penalty of perjury stating that he had reviewed the Schedules and SOFA and that they were true and correct, when he had not reviewed them, is inconsistent with his duty and is further evidence of cause... to convert." [Emphasis added] (p. 31)

5. The Court noted that although Stokes amended his Schedules and SOFA:

"[a]s before, Stokes signed his declarations under penalty of perjury that he had reviewed the amended Schedules and SOFA and that they were true and correct, ... they continue to have errors and omissions." [Emphasis added] (p. 31)

6. The Court noted that "so many of Stokes' representations on sworn declarations, and
regarding tax returns and financial data, turned out to be not true." (p. 32) "Based on the testimony and evidence above of the errors and omissions, the Court finds that the Debtor has failed to establish under § 1112(b)(2)(B) that a reasonable justification exists for his acts and omissions regarding his Schedules and SOFA, false declarations under penalty of perjury, failure to provide monthly operating reports... and failure to pay UST fees." [Emphasis added] (p. 35)

7. In its Conclusions of Law, the Court found the UST had established cause to convert
Stokes['] case to chapter 7 based, inter alia, upon Stokes' "numerous errors and omissions in his Schedules and Amended Schedules, Debtor's declaration under penalty of perjury that he had read and reviewed his Schedules when he had not when he signed them." [Emphasis added] (p. 36)

## IX. WIFE'S JOINT OWNERSHIP OF PROPERTY

1. The following summarizes the different ways that Stokes described the status of the ownership of his assets in various contexts during his bankruptcy case:

1) In his initial Schedules, Stokes did not disclose whether or not any of the assets he listed were owned just by him or were owned jointly with his wife.

2) In his first amended Schedules, he affirmatively placed "J" before many assets under the column which asks for debtors to disclose whether each item is owned by "Husband, Wife, Joint, or Community." [It is assumed "J" was meant to disclose "joint" ownership.] Only two items were listed with a "W": a 42" TV and a 2001 PT Cruiser sports van. Seven assets were revealed to be solely owned by "H" (vehicles, boats, and trailers). Some assets did not have any designation.

3) In his second amended Schedules, assets that had previously been disclosed as being owned jointly, such as real estate, were now listed

under the column calling for this information as merely " - ". That is, the "Js" had been removed and hyphens had been left in their place. The same was true for some personal property. Cash, bank accounts and other items were listed in the second amended Schedules as being owned by " - ". No items were listed anymore with a "W" or "H". Every item of personal property that did not have a hyphen in front of it, was now listed as being owned "J" or jointly.

2. The Court noted these discrepancies during the hearing on the UST's conversion motion. At hearing Tr. p. 81, the Court asked why, in the amended schedules, Stokes "designated most of the assets as joint,"...

THE COURT: Who's the joint owner?
THE WITNESS: My wife.
THE COURT: Okay. But she wasn't in the first –
THE WITNESS: No.
THE COURT: – schedule?
THE WITNESS: No. Well, the first schedules were a complete mistake. And I went through that with him, and I was just as shocked that day as you were.

3. In her Rule 2004 examination (at Tr. pp. 37-41), conducted on January 15, 2010 (FACTS Ex. 7), Stokes's wife, Pamela, testified that she owns very few assets with her husband:

Q There's a number of items of personal property, I would just categorize it as furniture and such, that were listed in your husband's schedules, bankruptcy schedules; coffee tables, recliners, TVs, dressers, chairs, entertainment center, beds, pool table, sofa, stereo, appliances. When he originally filed, those were all alleged to be his and only his. Is it your belief that some of those assets belong to you too?
A Oh, Yeah.
Q Would you say you're a half owner of all these assets?
A Well –
Q The family home?
A I would say so.
Q Okay. And he has guns?
A Yes.
Q And they are all his?
A No. A couple were from my father, so.
Q Which would you claim to be yours?
A I don't know. I don't know what, there's a shotgun. I don't know much about guns, so.
Q Maybe, how many guns are we talking about?
A Six.
Q That were your father's and now they're –
A On, no. I got a couple from my father.
Q Two.
A Yeah.
Q Okay. One being a shotgun and one being a regular rifle?
A Yes.

Q But you don't know what kind?

A Winchester, I think, I don't know. Never shot it.

Q How about all the fishing gear and such that your husband listed that he owned, do you have any interest in that or is that all his?

A That's his.

Q And the guitars, those are all his?

A Mm-Hmm.

Q You have to answer yes for her, ma'am.

A Yes.

Q And the accounts receivable, if any, for the business, they belong to John?

A Yes.

Q And the vehicles. Do you have any vehicles that your name appears on the title to?

A No.

Q So all of the vehicles belong to John?

A Yes.

Q All the boats belong to John?

A Well, I guess.

Q Okay.

A I would say one's mine, but I don't have a title for it.

Q Okay. All right. All of the office equipment and furnishings and such out at the radio station, that all belongs to John?

A Guess so.

Q Pardon me?

A I don't own any of that.

Q Okay. So, aside from half ownership in the furniture and appliances in the home, is there anything else out there that belongs to you or that you have an interest in?

A Like what? What do you mean?

Q I don't know, I've never been to your home. But I'm just saying, do you have any property that either belongs to you, yourself, or that belongs to you and John that we haven't talked about?

A No. ...

Q And I'm not concerned about property you inherited from your mother after the bankruptcy was filed. We're just focusing on what was around in March of 2009, that was still in the house, that we're trying to define who owns what. Fair enough?

A Okay.

Q And your testimony then would be that, aside from what we just talked about, you don't own anything else at the house?

A No.

Q Is that correct?

A Yes.

## X. PICKAVANCE HOUSE TRANSFERS

1. Elizabeth Pickavance is Stokes' daughter. (Pickavance Rule 2004 Tr., at p. 6; FACTS Ex. 6; all page references are to her examination)

2. She testified she acquired the house and property located at 12887

32

Raven Way, in Bigfork, Montana, many years ago "in case something ever happened to them" (her parents, Mr. and Mrs. Stokes): "If, for instance, if they got in a car wreck or both passed away or anything, they wanted it to be my house and not have to go through probate or a big deal to make it transition to me. So, it was my protection in case anything happened to them." (Tr. p. 15)

3. Since she acquired titled to the property, she has made no mortgage payments, no insurance payments, no real estate tax payments, and no utility payments. (Tr. pp. 6-17)

4 . She was seventeen and one-half when the Stokes deeded her the house, on August 31, 1998. (Tr. p. 17)

5. She originally testified she had never been asked by her parents to give the house back, and stated she never considered transferring the property back to them. (Tr. p. 18) [This was later proven to be untrue. See below.]

6. Exhibit 31 (FACTS Ex. 8) was identified by Pickavance as a quitclaim deed bearing her notarized signature, dated January 16, 2009, reflecting Pickavance as the Seller, and John and Pamela Stokes as the Purchasers, whereby Pickavance conveyed "unto Purchaser forever, all the right, title, interest and claim which Seller has in and to" the property commonly known as 12887 Raven Way, in Bigfork, Montana. (Tr. p. 83-84; and Ex. 31 - FACTS Ex. 6)

7. With regard to this quitclaim deed she was asked: (beginning on Tr. p. 85)

Q What – do you understand what the effect of this deed is?
A Yes, but it was never filed.
Q Okay. So, let's go back to my question. What was the effect of this deed?
A The effect of this deed was if something were to happen to me, after I was married for instance, if I, you know, died in a tragic accident, that my parents were able to take the house back, if something happened to me, without having to go fight my husband for it.
Q So, if something happened in an accident or if the marriage went south or whatnot, somebody could conveniently record this deed, and wwssch [sic]?
A If I died, yeah. (ending on p. 85)

* * * * *

Q Okay. Do you know where the original of this document is?
A No, I do not.
Q What happened after you had your social even with Ms. Coder? [The notary public.] Did Ms. Corder take the original with her, or did you take it with you?
A I believe I gave it to my father, after I took it with me that night, yes.
Q And you believe you gave it to your father at some point after that?
A Mn-hmm.
MR. COSSITT: Okay. Let me look at my notes, and I'll see if I have any

other
questions.
MR. JENSEN: Your last answer was yes?
THE WITNESS: Yes. I'm sorry, what was the last question again?
MR. JENSEN: That you gave the original to your father?
THE WITNESS: Yes.
MR. JENSEN: Would you know approximately when you gave it to your
father? Like that day?
THE WITNESS: Probably January 17th. (ending on p. 87)

* * * * *

Q Trent Gardner, I represent Davar Gardner and Todd Gardner. Do you
remember when Mr. Jensen was asking you questions and he asked if you
had ever talked to your parents about transferring the house back to them?
(Tr. p. 88)
A Mm-hmm.
Q And you indicated no. Do you recall that?
A No. I – okay.
Q Okay. If you had – if that is what you said, that's not accurate, because
obviously you talked to them about the quitclaim deed, right?
A Right.
Q So you did have discussions about transferring the house back to them?
A Yes, I guess so. Let me restate that then. (ending on Tr. p. 89)

* * * * *

MR. JENSEN: Just a couple of questions on Exhibit 31 before I turn it
over to Bob. This quitclaim deed that you gave to your mom and dad,
dated January 16, 2009, whereby you assigned your interest in the family
home to them? (Tr. p. 98)
A Mm-hum.
Q You're with me?
A Yes.
Q You signed this before a proper notary, on January 16, 2009, correct?
A Yes.
Q You know your lady friend to be a licensed notary in the state of
Montana?
A Yes.
Q And upon executing this quitclaim deed, you made delivery thereof to
your mother and father the next day?
A I believe so.
Q Okay. So you conveyed your interest in the home to them on January
17th, 2009, by making delivery of the deed to them?
MR. MURPHY: I'm going to object to the motion as calling –
THE WITNESS: No.
MR. MURPHY: I'm going to object –
MR. JENSEN: You are not her lawyer.
MR. MURPHY: I'm objecting – this could end up in court. I want to
object to the question calling for a legal conclusion, and I want that on the
record.

34

MR. JENSEN: All right.
THE WITNESS: No, I did not convey it to them. I gave them that piece of
paper if anything was to happen to me that they could convey the house
back to them.
Q But you physically delivered the quitclaim deed to your parents on
January 17, 2009, correct?
A Technically, yes. [Emphasis added] (ending on p. 99)

## XI. PICKAVANCE OBJECTION TO CONVERSION

1. Elizabeth Pickavance identified Exhibit 28 to her Rule 2004
examination as Docket No. 75 (FACTS Ex. 6): her objection to the UST's
conversion motion. (Tr. p. 46) She confirmed that she signed the document, but
admitted that her father prepared "most of it." (Tr. p. 46) She just "edited it." (Tr.
p. 47)

Q Okay. He prepared it first and then you edited it and then signed it?
A Mm-hmm.
Q You have to answer yes for her [the court reporter].
A Yes. [Emphasis added.] (Tr. p. 46)

2. She alleged she was a secured creditor (the largest in Stokes'
bankruptcy case), but when asked what she had a lien against she said "I'm not
sure." (Tr. pp. 47-48) The following dialogue occurred (at pp. 48-68):

MR. JENSEN: And what was your – what did you have a lien on?
MS. PICKAVANCE: The property in Kalispell, I believe.
Q The radio station?
A Yes.
Q Or the house you live in, or both?
A I'm not sure. [Emphasis added.]
Q Well, you signed this on, you know, filed this with the bankruptcy
court, you're affirming that everything in here is true, and you're saying
you don't even know what the first sentence pertains to?
A It's basically saying that I pledge the house in Lake County as collateral
towards Z-600, Incorporated. [She had earlier testified that Z-100, Inc. had
been dissolved by the Secretary of State by the time she "came on the
scene" and was "defunct for all intents and purposes." (Tr. p. 31)]
Q Is that what it's saying?
A I believe so.
Q All right. Well, it goes on to say: I hold a second deed and note by
assignment.  You're saying you own a second deed. Second to who? Who
holds the first deed?
A Z-100, I believe.
Q On the house?
A No, not the house. On the radio station.
Q So you're – I'm getting confused here.
A So am I. [Emphasis added]
Q Well, your signature's on this document?
A Yes.
Q You filed it with the court, you're, you know, verifying that this is a true

35

and correct document. And <u>I'm picking up that you don't even know what you were talking about here in the first sentence of two?</u>
A <u>Mm-hmm.</u> [Emphasis added]
Q Is that true?
A No. It's just a little cloudy in my head. It's just been eight years of interesting stuff going on. Basically what this is saying is that I had an interest and I opposed the conversion to Chapter 7 because I pledged security and I didn't want to lose that as an interest.
Q I just what to know, it says: I hold a second deed and note by assignment.
A Mm-hmm.
Q Assignment from who?
MR. STOKES: It's right there, Elizabeth.
MR. GARDNER: Hey, I object to Mr. Stokes trying to coach her on the record. (ending at Tr. p. 49)

* * * * *

BY MR. JENSEN: (Tr. p. 51)
Q I'm just trying to figure out what you meant when you wrote and signed the sentence that says: I hold a second deed and note by assignment?
A Yes.
Q Are we talking about the house your mom and dad live in that you own, or the radio station?
A The radio station.
Q <u>So you believe you have a second deed and note by assignment on the radio station?</u>
A <u>I did, but it was determined null and void.</u> [Emphasis added]
Q By who?
A The courts.
Q Which court?
A Wasn't it at the bankruptcy proceedings?
Q Was that before or after July 24, 2009?
A After.
Q Okay. And you say you're a secured creditor, because you have what as collateral?
A I have a mortgage, that was assigned to me, or given to me.
Q Mortgage –
A Between Z-600 and John Stokes.
Q Can you produce that document?
[Exhibit 30 is introduced (FACTS Ex. 15), which is a mortgage dated January 1, 2001, between Z-600, Inc., the mortgagor, and John P. Stokes, the mortgage, along with the underlying $978,000 promissory note. (Tr. p. 53; FACTS Ex. 15)]

* * * * *

Q <u>So how are you involved in this?</u>
A <u>It was given to me.</u>
Q <u>When you say given, in what fashion was it – was it formally assigned to you?</u>

36

A <u>I can't recall</u>.
Q <u>Do you have anything in writing that reflects the giving or the assignment of this mortgage to you?</u>
A <u>No, I don't believe so.</u>
Q <u>Was anything ever recorded?</u>
A <u>I do not know</u>. [Emphasis added] (ending at Tr. p. 53)

* * * * *

Q Well, and does this – was this document recorded? (Tr. p. 55)
A I do not know.
Q And there's a promissory note attached to it, for $978,000, right?
A Yes.
Q Dated January 2, 2001. Where John P. Stokes, the president of Z-600, Inc., agrees to pay John P. Stokes individually $978,000 with 15 percent interest, correct?
A That's what you're reading.
Q And the annual payments were to be $146,700, with a balloon payment within five years of $978,000. To your knowledge, as the bookkeeper of Z-600, Inc., were any of these payments ever made?
A I do not believe so.
Q Do you understand what transpired here? What was your understanding of what – why Z – why your father loaned nearly a million dollars to Z-600, Inc.?
A I do not know, personally. * * * * *
Q <u>But you're alleging that this note was at some point in time assigned to you?</u>
A <u>I believe so, I'm not entirely sure.</u>
Q <u>Well, on what basis do you think it was?</u>
A <u>My father told me.</u> [Emphasis added.] * * * * *
Q All right. <u>So you have nothing to prove that the – this note and mortgage were assigned to you?</u>
A <u>No. Not with me today.</u>
Q Pardon?
A <u>No.</u>
Q Just – <u>you were just told that it was being assigned to you?</u>
A <u>I believe so.</u>
Q <u>But you don't remember when that happened?</u>
A <u>No.</u> [Emphasis added] (ending at p. 57)

* * * * *

Q This document says that the balance owed at the time you signed this objection is $2.3 million? (Tr. p. 58)
A Mm-hmm.
Q <u>Where did that number come from?</u>
A <u>I don't recall. As I said earlier, my father and I wrote this together. I edited it</u>, and I – [Emphasis added.]
Q Well, you signed it.
A I did sign it.
Q Your name appears on the bottom of it. You're making the two – you're

alleging that you have a 2.3 million-dollar claim?
A Mm-hmm.
Q In this bankruptcy case. Do you understand the consequences of filing a false claim in a bankruptcy case?
A Yes.
Q So, is it your position today as you sit there, under oath, that you are owned $2.3 million?
A I believe so.
Q Where did the number come from?
A I don't recall.
Q Did you do any arithmetic, any mathematical calculations to arrive at 2.3 million?
A No. I personally did not.
Q Is this a number that was put in here by your father?
A Yes.
Q And you just took it at face value that it was correct?
A Yes.
Q You didn't do any independent verification to – as to whether this was a 1 million or 2 million or $50?
A No. [Emphasis added] (ending at p. 59)

* * * * *

Q So, in the middle of that document, it says: If the distress sale has occurred, full market value will not be realized; the first secured mortgage holder will most likely bid in their amount, you're talking about? (Tr. p. 60)
A Yes.
Q And then you have to – in order to protect my assets, I must make arrangements to obtain at least $1,100,000 in order to bid at the sale or be completely wiped out.  Where did you come up with that number, $1,100,000?
A I don't recall.
Q Do you have any idea what that pertains to, $1,100,000?
A I don't recall.
Q When you're saying you don't recall, do you mean you just flat out don't know, because this was created by your father, and you just signed it?
A Yes. [Emphasis added.]
Q Your third paragraph, or second paragraph, says: There now appears to be an offsetting claim between the debtor and the first secured creditor, whereas that creditor appears to have been engaging in usury, and the debtor may have an offsetting claim for them for 2.2 million?
A Mm-hmm.
Q Again, this is information your father put in here that you of your own independent knowledge don't have any idea what he's talking about?
A This is regarding the Questa loan.
Q Yes. And you're verifying here that you thought – you thought your father had an offsetting claim against Questa for $2.2 million?
A Because they went above the usury.
Q Okay. Where'd you come up with $2.2 million?

38

A <u>I can't recall off the top of my head.</u>
Q <u>You don't know where it came from, do you?</u>
A <u>No.</u>
Q <u>Your father came up with the number and you just signed it?</u>
A <u>Yes.</u> [Emphasis added.] (ending at p. 62)

* * * * *

Q So it sounds like two different lis pendens? (Tr. p. 65)
A Oh.
Q <u>Did you file one or did your father file one, or did your mother file one?</u>
A <u>I did not.</u>
Q All right. <u>Well, who are you talking about here? Who's the other one?</u>
A <u>I do not know.</u>
Q <u>Again, this is something your dad put in here and you just signed it,</u>
<u>correct?</u>
A <u>Correct.</u> [Emphasis added.]

* * * * *

Q <u>It says you did some research, and it appears the average bankruptcy</u>
<u>liquidation proceeding for an FCC license is six or seven years.  What</u>
<u>research did you do?  Or was this research that John did?</u>
A <u>It was research that John did.</u>
Q <u>So when it says, I have done some research, that's not correct?</u>
A <u>Well, I helped him but, no, he did the bulk of it, yes.</u>
Q Says: If this Chapter 11 is converted to Chapter 7, I, meaning you, will
have no choice but to appeal that decision. Was that – what was your
thinking there?
A Based on the mortgage that has already been nullified, so.
Q But you didn't appeal the conversion decision?
A No.
Q <u>This your dad's writing again?</u>
A <u>Mm-hmm.</u>
Q <u>And you just signed it?</u>
A <u>Yes.</u>
Q <u>Do you have a claim against your father's bankruptcy estate for any</u>
<u>reason?</u>
A <u>I am owned [sic] some back wages.</u>
Q <u>Other than for some back wages, do you have a claim against your</u>
<u>father's bankruptcy estate?</u>
A <u>No.</u>
Q <u>And how much are the back wages?</u>
A <u>About four months, so, probably about $4500?</u>
Q <u>Okay. So you're owed about $4500 from John Stokes?</u>
A <u>Yes.</u>
Q <u>But John Stokes owes you nothing aside from the $4500. Is this your</u>
<u>testimony?</u>
A <u>I believe so.</u>  [Emphasis added.] (ending on Tr. p. 68)

**XII. OTHER EVIDENCE OF STOKES' EFFORTS TO HINDER OR DELAY**

**CREDITORS**

Stokes took his name off of all bank accounts in order to hinder or delay the efforts of his creditors from recovering on judgments against him. (Pickavance 2004 Exam, Tr. pp. 26-28; and 91-92; FACTS Ex. 6)

MR. JENSEN: So until the date of the filing of the bankruptcy, the only account that the radio station had was at Rocky Mountain Bank?
MS. PICKAVANCE: Correct.
Q And you and your father were both signators on that account?
A No. I was the only one.
Q You were the only one. Your father was not?
A Mm-hmm.
Q What was the reason why your father's name didn't appear on that account?
A Because he had issues with people stealing, or going in and taking money out of his accounts. So, they just put my name on it.
Q Like creditors?
A Mm-hmm.
Q Okay. They didn't steal the money, but they would get a judgment against him and try to levy on the account?
A Mm-hmm.
Q So your name was placed on it to avoid that happening?
A Mm-hmm. [Emphasis added]
Q When was that done, do you know?
A I cannot recall.
Q Years ago, or recently?
A I would say so. I would say within the last two years probably.
Q Well, did that occur after the Gardner judgment was entered?
A No.
Q Your name was on there before?
A Before.
Q Your dad's name was off of the account and your name was on the account before the Gardner's got a judgment?
A Correct.
Q Maybe a year or two prior to that?
A Yeah.
Q He had other creditor issues where other people were trying to sue him and garnish his bank account?
A Correct. [Emphasis added] (ending on Tr. p. 28)

* * * * *

MR. GARDNER: Okay. The account with Skyline Broadcasters and your name on it, that Mr. Jensen asked you about, you testified that your name was put on it and your father's taken off it because people were executing on the accounts, right?  (Tr. p. 91)
A Yes.
Q So you were aware that certain people, including my clients, had judgments against your father and his businesses and were executing on the accounts trying to collect those judgment, correct?

40

A Correct.
Q And so you assisted your father in taking his name off the accounts and putting your name on the account, correct?
A I didn't assist him, but, sure.
Q You were part if it?
A Yes.
Q They put your name on the account?
A Yes.
Q And this was done for the purpose of preventing the Gardners from collecting their judgment, correct?
A Not just the Gardners, but yes.
Q But other people as well?
A Yes.
Q So this was done to prevent creditors from collecting amounts owed to them?
A You could twist it that way, yes.
Q I'm not trying to twist anything. That's what you testified to, correct?
A Okay. Yes. [Emphasis added] (ending at Tr. p. 92)

Stokes filed a brief in opposition, and filed a Statement of Genuine Issues of

Material Fact (Dkt. 29) which sets forth the following:

1. The Debtor did not conceal property of the estate before or after the date of filing with the intent to hinder, delay, or defraud creditors.
See the declaration of John Stokes which shows that he followed the advice of counsel in signing the original schedules. a See plaintiff's brief which concedes that defendant volunteered at the first 341 meeting tha[t] the schedules were not complete.

2. The defendant in fact does not have a life estate or interest in his residence. See the affidavit of Stokes and the quit claim deed attached to it conveying the property to his daughter in 1998.

3. The defendant did not make a false oath or account. See Stokes declaration.

4. Defendant did not submit a false claim and did not offer his daughter any money, property or advantage to induce her to act. See Stokes Affidavit. See Pickavance 2004 transcript, plaintiff's exhibit 6 pg 68.

5. Debtor did not disobey a court order.

Stokes' Statement (Dkt. 29) is accompanied by a "Declaration Under Penalty of Perjury"

signed by Stokes, and a copy of the quitclaim deed from Stokes and his wife to their daughter

Elizabeth dated August 31, 1998.

41

# DISCUSSION

## I. **Summary Judgment**.

Summary judgment is governed by FED. R. BANKR. P. 7056.  Rule 7056, incorporating FED. R. CIV. P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial."  *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial."  *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e)*.  See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute").  That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods.,*

*Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

After review of the UST's Motion and brief, SOUF quoted above, Stokes' brief and Declaration, and supporting exhibits and transcripts, the Court finds that the UST satisfied its initial burden to identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv.,* 809 F.2d at 630. However, the Court further finds and concludes that Stokes set forth specific facts in his Statement and Declaration showing that genuine material issues of fact remain in dispute with respect to his intent, and whether omissions from his Schedules and Statements were by mistake or upon honest advice of his former attorney. *In re Retz*, 364 B.R. 742, 758 (Bankr. D. Mont. 2007). The Court repeats the

43

rule that, when deciding summary judgment, "[a]ll reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party." *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

## II.  Count One – § 727(a)(2) – Concealment or Transfer of Assets.

Certain principles or factors are common and apply to each of the UST's claims for denial of discharge under § 727(a). First, "[i]n keeping with the 'fresh start' purposes behind the Bankruptcy Court, courts should construe § 727 liberally in favor of the discharge and strictly against a person objecting to the discharge." *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernhard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007). The "fresh start" is explained by the Ninth Circuit Bankruptcy Appellate Panel *In re Albarran*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767

44

(1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." 498 U.S. at 286, 111 S.Ct. at 659.  The party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9th Cir. 2006).  The burden on the objector is to show actual rather than constructive intent on the part of the debtor.  *Retz*, 606 F.3d at 1196; *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd*, 578 F.3d 1167, 1168 (9th Cir. 2009).

Count One is based upon § 727(a)(2) and alleges that Stokes concealed assets, claims and transfers which he valued at millions of dollars in his Schedules and Statements, with great disparities in valuations of listed assets, that he concealed receipt of a quitclaim deed from his daughter Elizabeth, and that he concealed an assignment to his daughter of a note and mortgage. The UST urges the Court to find intent by Stokes to hinder, delay or defraud creditors under Count One based on his course of conduct, and argues:  "A good case can be made that

45

practically everything he does is done with intent to hinder, delay or defraud his creditors."

Stokes denies that he intended to hinder, delay or defraud his creditors or the Trustee.  He

contends that he relied on his former attorney in preparing his schedules, and that he admitted

early on that his schedules were inaccurate and needed amendment, which he did with his new

attorneys.

> Section 727(a)(2) provides that the court shall grant the debtor a discharge unless-

>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

>>> (A) property of the debtor, within one year before the date of the filing of the petition; or

>>> (B) property of the estate, after the date of the filing of the petition.

*Retz*, 606 F.3d at 1200; *Hansen v. Moore (In re Hansen)*, 368 B.R. 868, 876 (9th Cir. BAP 2007).

A party seeking denial of discharge under § 727(a)(2) must prove by a preponderance of

the evidence:  "1) a disposition of property, such as transfer or concealment, and 2) a subjective

intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of

the property."  *Retz*, 606 F.3d at 1200, quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237,

1240 (9th Cir. 1997).  Stokes admits making omissions and mistakes in his Schedules.  Therefore,

the UST has satisfied the first requirement of § 727(a)(2) showing concealment or dispositions of

property by Stokes with respect to Count One.  The UST's burden remains to show subjective

intent by the Debtor to hinder, delay or defraud.  Stokes denies concealing assets with fraudulent

intent, and contends that the UST's evidence of intent "is actually very weak."

A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). *Retz*, 606 F.3d at 1200. Because the language of § 727(a)(2) is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay or defraud a creditor or trustee. *Id.,* citing *Bernard*, 96 F.3d at 1281; *Searles*, 317 B.R. at 379. In other words, intent to defraud need not be shown because mere proof of intent to hinder or to delay is sufficient. *In re Beverly*, 374 B.R. 221, 243 (9th Cir. BAP 2007)*,* citing *Searles*. On the other hand, a § 727 finding of a transfer or concealment of property with intent to hinder, delay or defraud is a finding of fact. *Beverly*, 374 B.R. at 230, 243; *Adeeb*, 787 F.2d at 1342; *Searles*, 317 B.R. at 379. Stokes' Declaration accompanying his Statement of Genuine Issues is evidence which weighs against the UST's thorough and extensive factual allegations in the SOUF and supporting exhibits.

Intent may be inferred from surrounding circumstances including "badges of fraud" that constitute circumstantial evidence of intent, or a course of conduct. *Retz,* 606 F.3d at 1200, (citing *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992)); *Adeeb*, 727 F.2d at 1343, *Devers*, 759 F.2d at 753-54; and *Searles*, 317 B.R. at 380. "Badges of fraud" which support a finding of fraudulent intent include:

> (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Retz*, 606 F.3d at 1200, quoting *Woodfield*, 978 F.2d at 518; *Beverly*, 374 B.R. at 243.

With respect to Stokes and his daughter Elizabeth, certain badges of fraud are present in the record as shown by examination transcripts quoted extensively above, and in the exhibits. As

47

the Ninth Circuit Bankruptcy Appellate Panel ("BAP") held *Beverly*, 374 B.R. at 237:

> These statements are properly part of the summary judgment evidence because they were proffered by the trustee as affidavit exhibits and, in the words of Rule 56(e), "would be admissible in evidence." Fed.R.Civ.P. 56(e), incorporated by Fed. R. Bankr.P. 7056. Specifically, Beverly's own statements, when offered against him, are admissions that are not hearsay. Fed.R.Evid. 801(d)(2). It was established that during depositions Beverly authenticated the letters containing these statements.

The BAP in *Beverly* described the cumulative effect of a trustee's direct and circumstantial summary judgment evidence, which was probative of intent to hinder, delay, or defraud creditors, as "powerful."  374 B.R. at 238.  So powerful and "overwhelming" was the evidence in *Beverly*, in fact, that the BAP reversed a contrary conclusion as clear error.  *Id.* at 243.

The instant case is distinguishable from *Beverly*.  In *Beverly* the Bankruptcy Court for the Central District of California combined discharge objection proceedings with cross-motions for summary judgment in a trustee's avoidance action, and the parties "proceeded solely by declaration, deposition, and documentary evidence and chose not to present live testimony in open court." 374 B.R. at 229.  Stokes has not filed a cross-motion for summary judgment.  There is no indication that Stokes has elected to proceed solely by declaration, deposition and documentary evidence, or that Stokes has chosen not to present live testimony in open court. Such procedure is not followed in this Court unless the parties specify beforehand on the record that they agree to submit a matter on stipulated facts and briefs.  Because no indication exists that Stokes has chosen not to present live testimony in open court, this Court declines to follow the procedure followed in *Beverly*.

Stokes denies in his Declaration having any intent to hinder, delay or defraud creditors or

the Trustee.  He argues that the omissions and errors were caused by his reliance on his former

attorney.  Since the finding of a transfer or concealment of property with intent to hinder, delay

or defraud is a finding of fact, *Beverly*, 374 B.R. at 230, 243 (citing cases), and the record

submitted includes conflicting evidence, this Court must resolve all reasonable doubt as to the

question of intent against the UST as the moving party.  *Liberty Lobby*, 477 U.S. at 247-48, 106

S.Ct. at 2509.  The Court allows that a rational trier of fact might resolve the dispute about intent

to hinder or defraud under § 727(a)(2) raised during this summary judgment proceeding in favor

of the nonmoving party, Stokes, so summary judgment must be denied.  *T.W. Elec. Serv.*, 809

F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

  This Court denied summary judgment in *Retz* based upon the sworn statements of the

debtor and his attorney that debtor was following his attorney's legal advice, in a case involving

the requisite intent under § 727(a)(4).  364 B.R. at 759.  The Court wrote:

> Whether that evidence holds up at the time of trial involves questions of fact.  "A
> common instance of 'false oath' is when a debtor declares that the schedule of
> property is true and correct and it appears that the debtor has knowingly and
> fraudulently omitted assets from it.  But if items were omitted by mistake or upon
> honest advice of counsel, to whom the debtor had disclosed all the relevant facts,
> the declaration will not be deemed willfully false, and the discharge should not be
> denied because of it."  6 COLLIER ON BANKRUPTCY ¶ 727.04[2] (15th ed. rev.)
> (citing *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974)) ("explanation by a
> bankrupt that he had acted upon advice of counsel who in turn was fully aware of
> all the relevant facts generally rebuts an inference of fraud").  Given the
> statements of Dye, material factual issues exist as to Retz's knowingly and
> fraudulently making a false oath with requisite intent.

*Retz*, 364 B.R. at 758.

  Stokes' Declaration states and he argues that he relied on his former attorney Greg

Duncan in filing his Schedules and Statements which included the errors and omissions listed in

detail above.  This Court considers this evidence sufficient to raise a genuine issue of material fact under Count One as well as Count Two as to intent.

### III.  Count Two – § 727(a)(4) – False Oaths.

Count Two seeks denial of Stokes's discharge under § 727(a)(4) for signing his Schedules knowing they had "overwhelming" errors, omissions and falsehoods itemized above, and in addition asserting his wife's joint ownership of property, his gift of the house to his daughter reserving a life estate and her $2.3 million secured claim listed when he was acting on his own behalf.  The UST quotes this Court's decision converting this case to Chapter 7 in support of summary judgment under Count Two, and quotes *Retz* which arose from this District.  Stokes' defense is similar to his objection to Count One, i.e., that he relied on and followed his first attorney's directions, and that there is no showing of intent to mislead.

If the UST seeks application of the doctrine of collateral estoppel, his brief does not discuss the doctrine or provide a satisfactory showing that its requirements are met to apply it. The issues raised in this adversary proceeding under § 727(a) are not identical to the issues decided by this Court in its Order converting the case.  In *Retz* this Court denied the plaintiff's motion for partial summary judgment motion based on § 727(a)(4), and that matter was decided after a trial which took five days to complete.

The Ninth Circuit provided the analysis under § 727(a)(4) in *Retz*:

> Section 727(a)(4)(A) states:  "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account...."  11 U.S.C. S 727(a)(4).  "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath."  *In re Khalil*, 379 B.R. at 172.  "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.  *Id.*

(quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999)).

 To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *In re Wills*, 243 B.R. at 62). A finding of fraudulent intent is a finding of fact reviewed for clear error. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

*Retz*, 606 F.3d at 1196-97.

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is a single false oath or account. *In re Wright*, 364 B.R. 51, 73 (Bankr. D. Mont. 2007); *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999) (*citing Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149, 150-51, 17 Mont. B.R. 43, 44-46 (Bankr. D. Mont. 1999)). "A false oath may involve a false statement or omission in the debtor's schedules." *Wills*, 243 B.R. at 62; *Searles*, 317 B.R. at 377, citing *Wills*; *Wright*, 364 B.R. at 73. Stokes does not dispute that his Schedules contained several errors and omissions, or that they are material, but he contends that he volunteered that his Schedules were wrong and missing assets, and he denies he made the false oaths with fraudulent intent.

The UST bears the burden of showing that: (1) Debtor made the false statements or omissions in his Schedules and SOFA; (2) at the time he knew they were false; and (3) he made them with the intention and purpose of deceiving the creditors. *Retz*, 606 F.3d at 1198-99 quoting *Khalil*, 379 B.R. at 173 (quoting *Roberts*, 331 B.R. at 884). For purposes of summary judgment, based on Stokes' Declaration that he relied on his first attorney and did not make representations or omissions with fraudulent intent, the Court finds, as it did in *Retz,* that Stokes

51

has established the existence of genuine issues of material fact on whether he made the representations and omissions in his Schedules and Statements with the intention and purpose of deceiving the creditors. *Retz*, 364 B.R. at 759; *Retz*, 606 F.3d at 1198-99 (quoting cases).

### IV. Count Three – § 727(a)(4)(B) – False Claim.

Count Three seeks denial of Stokes' discharge under § 727(a)(4)(B), alleging that Stokes "knowingly and fraudulently, in or in connection with the case – . . . (B) presented or used a false claim." In Count three the UST contends that Stokes violated § 727(a)(4)(B) by preparing the objection which his daughter Elizabeth filed against the UST's motion for conversion of his case to Chapter 7, which the UST contends alleged that she was Stokes' largest secured creditor with a claim for $2.3 million. The UST's SOUF includes excerpts from Elizabeth's 2004 examination where she acknowledged that Stokes prepared her objection and she just signed it without knowing what was in it.

Stokes objects to summary judgment on Count Three. Stokes admits that he prepared the objection to the motion to convert that his daughter signed. But Stokes argues that Elizabeth's examination establishes that she actually was owed $4,500 for back wages and as such she was a creditor entitled to file a claim, although she did not file a proof of claim. Stokes points out that Elizabeth's objection to the motion for conversion was overruled and the case was converted.

Count Three, like Counts One and Two, requires the UST to show that no genuine issue of material fact exists that Stokes knowingly and "fraudulently" presented or used a false claim. Stokes denies that the objection which Elizabeth filed opposing conversion was a false claim. Keeping in mind the heavy burden the UST has for summary judgment, the Court finds that the UST has failed to satisfy its burden to show that there is no genuine issue of material fact to

52

whether Stokes fraudulently presented or used a false claim under § 727(a)(4)(B).

This Court must resolve all reasonable doubt as to the question of fraudulent intent against the UST as the moving party. *Liberty Lobby*, 477 U.S. at 247-48, 106 S.Ct. at 2509. Count Three relies mainly on Elizabeth's 2004 examination testimony, but as the UST's brief states she did not know what was in the objection or where the numbers came from, she just signed it. Section 727(a)(4)(B) requires evidence that the Debtor knowingly and fraudulently used Elizabeth's objection as a false claim in connection with his case, but he offered no evidence that Stokes used the objection "fraudulently" other than a bare assertion: "Clearly, Stokes has done so here." That is attorney argument, not evidence of fraudulent use by Stokes. This Court considers that a rational trier of fact might resolve the dispute about fraudulent intent under § 727(a)(4)(B) raised during this summary judgment proceeding in favor of the nonmoving party Stokes, and therefore summary judgment under § 727(a)(4)(B) must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

## V.  Count Four – § 727(a)(4)(C) – Attempt to Gain Advantage.

Count Four is based on § 727(a)(4)(C) which denies a discharge if

(4) the debtor knowingly and fraudulently, in or in connection with the case –

* * * *

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act.

To sustain an objection under § 727(a)(4)(C), the objecting party must establish:

(1) knowledge and a fraudulent intent on the part of the debtor; and
(2) receipt of, or an attempt to obtain, or the giving or offering of, money, property or advantage, or a promise of these, for a purpose, namely, action or forbearance in the case in which the offender is a debtor.

6 COLLIER ON BANKRUPTCY ¶ 727.06 (16th ed. 2010).  COLLIER explains:

> Section 727(a)(4)(C) clearly contemplates the denial of a discharge to debtors who accept a "bribe," i.e., money or property, advantage or a promise of these for acting or forbearing to act in or in connection with the case.  It also includes the giving or offering of a bribe by the debtor.

*Id.*

Like Count Three, the UST cites Elizabeth's objection to the motion for conversion of the case as the means by which Stokes attempted to obtain an advantage, including seeking to validate his second deed and note by assignment to Elizabeth for $2.3 million in order to defeat the motion for conversion.  The UST sets forth six (6) "variations" or "scenarios" at pages 22-23 of its brief.  As with the previous three Counts, however, the UST failed to satisfy its burden to show that there is no genuine issue of material fact to whether Stokes "fraudulently" attempted to obtain advantage under § 727(a)(4)(C).

This Court must resolve all reasonable doubt as to the question of fraudulent intent against the UST as the moving party.  *Liberty Lobby*, 477 U.S. at 247-48, 106 S.Ct. at 2509.  Count Four cites Stokes § 341 meeting transcript, Schedules, and discovery responses as supporting evidence.  Section 727(a)(4)(C) requires evidence that the Debtor knowingly and fraudulently used Elizabeth's objection as an attempt to gain advantage.  Stokes' Statement of genuine issues states that he did not offer his daughter any money, property or advantage to induce her to act.  Stokes' Declaration at paragraph 18 on page 7 explains his assignment of a note and mortgage to Elizabeth which he felt had a value of $2,314,750.00.  His new attorneys advised him that he had no security that he could assign.  This Court considers that a rational trier of fact might resolve the dispute about fraudulent intent under § 727(a)(4)(C) raised during this

54

summary judgment proceeding in favor of the nonmoving party Stokes, and therefore summary

judgment under Count Four, § 727(a)(4)(C), must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630;

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

### VI.  Count Five – § 727(a)(5) – Attempt to Gain Advantage.

Count Five seeks denial of Stokes' discharge under § 727(a)(5) for failure to explain

satisfactorily a loss of assets.   Under § 727(a)(5) an objecting party bears the initial burden of

proof and must demonstrate:  (1) debtor at one time, not too remote from the bankruptcy petition

date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief

granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of

affairs do not reflect an adequate explanation for the disposition of the assets.  *Ballew v. Ballew*

*(In re Ballew)*, 18 Mont. B.R. 404, 417-18 (Bankr. D. Mont. 2000).

Once the objecting party has met the initial burden of proof, the burden then shifts to the

debtor to provide a satisfactory explanation for the disposition of the assets.  *Ballew*, 18 Mont.

B.R. at 418; *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).  In *Ballew*

the Court found that the debtor's amendments to schedules and amended statement of financial

affairs provided the requisite information to satisfy debtor's burden under § 727(a)(5) and denied

the creditor's request for denial of discharge, "especially in light of the fact that objections to

discharge are to be construed liberally in favor of the debtor and strictly against those objecting

to discharge".  *Ballew*, 18 Mont. B.R. at 418.  Later *In re Lacounte*, 342 B.R. 809, 815 (Bankr.

D. Mont. 2005) this Court quoted the Ninth Circuit decision affirming this Court in *Devers v.*

*Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985):  "A debtor's failure to offer a

satisfactory explanation when called on by the court is a sufficient ground for denial of discharge

under section 727(a)(5)."

Applying these principles to Count Five, the Court finds that the UST has failed to satisfy its burden to show that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law.  The UST argues that Stokes failed to explain satisfactorily how the 2nd mortgage on Z-600, Inc., worth an alleged $2.3 million came to belong to his daughter.  The UST recognizes, as Stokes' new attorneys advised him, that when Z-600, Inc., was dissolved in 2002 a merger occurred and Stokes, as sole shareholder, no longer had any security to assign. The UST argues that Stokes' explanation is "wholly unsatisfactory" and that his discharge should therefore be denied.  Stokes contends that his new attorneys explained to him that the mortgage merged when Z-600, Inc., was dissolved.  Therefore, Stokes argues, his attempted assignment of the note and mortgage to Elizabeth was not a loss of assets, and that is why when Stokes new attorneys amended his Schedules the note and mortgage were not listed.

Taking the UST's brief at page 24 on its face, if the corporation Z-600, Inc., was dissolved in 2002, seven (7) years prior to Stokes' Chapter 11 bankruptcy filing, the Court fails to see how that is not too remote from the bankruptcy petition date for § 727(a)(5) to apply. *Ballew*, 18 Mont. B.R. at 417-18.  Both sides appear to agree that the note and mortgage was extinguished by merger.  This Court considers that a rational trier of fact might resolve the dispute about whether Stokes has failed to explain satisfactorily a loss of an apparently non-existent asset under § 727(a)(5) raised during this summary judgment proceeding in favor of the nonmoving party Stokes, and therefore summary judgment under Count Five, § 727(a)(5, must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

### VII.  Count Six – § 727(a)(6)(A) – Failure to Obey Court Order.

Count Six of the UST's complaint seeks denial of Stokes' under § 727(a)(6)(A), which provides that the court shall grant the debtor a discharge, unless – "(6) the debtor has refused in the case – (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify ...."  The UST argues that Stokes did not comply with this Court's Order (Dkt. 120) to turn over all assets of the estate until the Trustee was forced to file a motion to hold Stokes in contempt.  Stokes contends that the Trustee took immediate possession of the radio station property, that the Trustee has seen and arranged for valuation of the Debtor's firearms and guitars, but that this Court has allowed him to amend his Schedules to claim exemptions.  That is correct.

Docket No. 330 and 331 in Case No. 09-60265 are this Court's Memorandum of Decision and Order denying the Trustee's second motion for turnover with respect to firearms, musical instruments and fishing equipment because Stokes was entitled to amend his Schedule C claiming exemptions.  Later, the Trustee filed a motion for order to show cause (Dkt. 342), but withdrew that motion at Dkt. 351.  The UST admits that the Trustee withdrew the contempt motion, but seeks denial of Stokes' discharge notwithstanding.

This Court considers that a rational trier of fact might resolve the dispute about whether Stokes has refused to obey a lawful order of this Court under § 727(a)(6)(A) raised during this summary judgment proceeding in favor of the nonmoving party Stokes, and therefore summary judgment under Count Six, § 727(a)(6)(A), must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

57

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction via 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(1).

2.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3.  Plaintiff failed its heavy burden under FED. R. BANKR. P. 7056, incorporating FED. R. CIV. P. 56(a) to show that there is no genuine dispute as to any material fact with respect to Counts One, Two, Three, Four, Five, and Six.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above denying the UST's Motion for Summary Judgment (Dkt. 22).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana